St. Louis, Iron Mountain & Southern R'y vs. Loftin, Collector.

St. Louis, I. M. & S. Railway vs. Loftin, Collector.

| 30 | 693 |
|----|-----|
| 57 | 448 |
| 30 | 693 |
| 70 | 580 |
| 70 | 591 |
| e70 | 592 |

1. CORPORATION: *Exemption from taxation, repeal of, etc.*

An exemption from taxation, conferred by the Legislature on a corporation subsequent to its creation, may be repealed. The right of taxation cannot be parted with by one Legislature so as to bind future Legislatures, unless under peculiar and exceptional circumstances, and upon an adequate consideration, and no presumption in favor of exemption from taxation can be indulged.

2. ————, *Constitutional Law, exemption from taxation, etc.*

An exemption from taxation, contained in the charter of a corporation, cannot be repealed without the consent of the corporation.

3. ————, *Same, construction of charter.*

The 11th section of the charter of the Cairo and Fulton Railroad Company provides: That the capital stock and dividend of the company shall be forever exempt from taxation; the road, fixtures and appurtenances shall be exempt from taxation until after it pays an interest of not less than ten per cent. per annum. By the *capital stock* is meant the capital to be raised by stock subscriptions; the lands granted by Congress to aid in the construction of the road are not embraced, nor exempt from taxation. Money arising from the sale of the lands might be applied to the building of the road and thus become exempt from taxation. The road and appurtenances are under the second clause of the section exempt, until it yields a net profit of ten per cent. per annum on the cost of building and equipping it.

APPEAL from *Jackson* Circuit Court in Chancery.

Hon. WILLIAM BYERS, Circuit Judge.

*Rose, and Loughborough & Moore,* for appellant.

*Mayor of Baltimore* v. *Baltimore & Ohio R. R.,* 6 Gill, 288.

*Rome R. R.* v. *Mayor of Rome,* 14 Ga., 375, to show property part of capital stock.

Legislation establishing a certain rate of taxation excludes a different rule. Lands cannot be taxed when stock is exempt. *Augusta* v. *Ga. R. R. & B. Co.,* 26 Ga., 661. Capital stock includes all property, real and personal. *New Haven* v. *City Bank,* 31 Conn., 106. The courts incline against double taxes. *Osburne* v. *New York R. R. Co.,* 48 Conn., 491.

Capital stock represents and covers all the property, and when a period is fixed for taxation to commence the property is exempt till then. *Hannibal R. R.* v. *Shacklett*, 30 Mo., 550.

Exemption of all the works exempts lands. *Richmond* v. *Richmond & Danville R. R.*, 21 Gratt., 606 ; *Baily* v. *Clark*, 21 Wall., 284.

One mode of taxation excludes all others, and capital stock includes lands. *State Bank* v. *Brackenridge*, 7 Blackf., 595 ; *State* v. *Hood*, 15 Rich. Law, 184.

Contemporaneous construction against the power to tax. It has never before been exercised. *Packard* v. *Richardson*, 17 Mass., 121 ; *Stuart* v. *Laird*, 1 Cranch., 299 ; *Rogers* v. *Goodwin*, 2 Mass., 477–8. Grant operated *in presenti*. *Fletcher* v. *Pool*, 20 Ark., 100 ; *Schwanberg* v. *Harriman*, 21 Wall., 44.

*Benjamin & Barnes*, for appellee.

Section 11, of Cairo and Fulton charter, complete in itself, and inconsistent with sec. 25, of Miss. Valley R. R. charter. Sedgwick on Stat. & Const. Law, 124.

The company accepted the changes in their charter made by acts of 1855 and 1856, and are bound by the amendments. *N. Missouri R. R. Co.* v. *McGuire*, 20 Wall., 46 ; *Tomlinson* v. *Jessup*, 15 Wall., 454 ; *Gordon* v. *Tax Appeal cases*, 3 How., 133 ; *Comm'rs. of Washington* v. *Franklin R. R. Co.*, 34 Wall., 134 ; *Hannibal & St. Jo. R. R. Co.* v. *Shacklett*, 3 Mo., 550.

Section 13, act of 1856, does not make the two and a half per cent. *in lieu* of all other taxes. Surrender of right to tax by State never implied; when expressed it refers only to *State* tax, and not to counties and towns. *St. Jo.* v. *St. Jo. & H. R. R. Co.*, 39 Mo., 476 ; *Pacific R. R. Co.* v. *Dalle*, 48 Mo., 282 ; *Orange & A. R. R.* v. *Alexandria*, 17 Gratt., 176. Exemption of "capital stock" does not apply to lands. *State* v. *Newark*, 1 Dutcher, 315; *Iowa Homestead Co.* v. *Webster Co.*, 21 Ia., 221 ; *Dubuque & Pacific R. R. Co.* v. *Webster Co.*, 21 Iowa, 235 ; *W. T. R. R. Co.* v.

St. Louis, Iron Mountain & Southern R'y vs. Loftin, Collector.

*Lincoln Co.*, 1 Dillon, 314; *McShane* v. *R. R. Co.*, I. Cent. L. P., 104; *Thompson* v. *R. R.*, 9 Wall.; *N. Orleans* v. *Com. Bank*, 5 Rob., 151; *New Orleans* v. *N. O. & C. R. R. Co.*, 10 Rob., 187; *Railroad* v. *Berks Co.*, 6 Penn., ch. 701; *Louisville Railway* v. *Louisville*, 4 Rush., 479; *Delaware Railroad Tax case*, 18 Wall., 206; *Erie R. R.* v. *Pennsylvania*, 21 Wall., 492.

The company failed in its part of the contract and can claim nothing by it. The extension of time did not extend the relinquishment of power to tax. *Gordon* v. *The Appeal Tax cases*, 3 How., 133. *A fortiori* as to the effect of the Congressional extension on the State's power.

*S. P. Hughes, Attorney General*, for appellee,

Throughout all the legislation it is obvious that the legislature contemplated a distinction between capital stock and the property of the company. The former means the amounts contributed by the stockholders. *State* v. *Norristown Fair Association*, 3 Zabr., (N. J.) 195; *State* v. *Newark*, 2 Dutch. N. J., 519. Does not apply to property, not used or occupied for the necessary purposes of the company; (*supra.*) 213; *Vermont Central R. R. Co.* v. *Town of Burlington*, 28 Vt., 193.

When the charter was enacted the company had no lands to which the term capital stock could apply.

All rights, privileges, and immunities not expressly granted are reserved.

*Bailey* v. *McGuire*, 22 Wall., 215; *Tucker* v. *Ferguson*, 22 Wall., 527.

The two and one-half per cent. in section 13 of act of 1856 is not in lieu of other taxes. *Louisville R. R.* v. *Louisville*, 4 Bush. 479; Del. R. R. Tax case, 18 Wall., 206; Erie tax case, 21 Wall., 492. Still counties, cities, and towns may tax. *St. Jo.* v. *St. Jo. R. R. Co.*, 39 Mo., 476; *Pacific R. R. Co.* v. *Dadle*, 48 Mo., 282; *Orange & A. R. R.* v. *Alexandria*, 17 Gratt., 176.

St. Louis, Iron Mountain & Southern R'y vs. Loftin, Collector.

WALKER, J.:

The plaintiff, a corporation, organized and chartered under an act of incorporation passed by the General Assembly of the State of Arkansas. brought suit in the Jackson Circuit Court against John R. Loftin, to enjoin him as collector of taxes in said county, from the collection of the taxes assessed and levied upon the lands of plaintiff, which were granted by the United States to the State of Arkansas, to aid in making the Cairo and Fulton railroad, and by the State granted to said company, and which by acts of consolidation became, and are now the property of plaintiff.

It is alleged in the complaint that under the charter, and subsequent acts of the Legislature, the lands were exempt from taxation. That defendant, as collector of taxes, threatens to sell the land for the payment of the taxes so assessed, and unless restrained by injunction will proceed to do so.

The defendant entered his appearance, and filed a demurrer to the bill, which was by the court sustained, and the bill dismissed for want of equity. From which judgment plaintiff has appealed to this court.

The sufficiency of the bill to entitle the plaintiff to the relief prayed is presented for consideration.

Plaintiff states that by an act of the General Assembly of the State of Arkansas, approved January 12th, 1853, the Cairo and Fulton railroad was duly incorporated, and that among other things, it was in said act provided: That the rights, privileges, immunities and franchises, contained in a charter of the same date granted to the Mississippi Valley Railroad Company, not restricting, or inconsistent with the charter of the Cairo and Fulton railroad, were extended to, and form a part of the Cairo and Fulton charter as fully as if inserted therein.

That said acts were declared public acts, and were to be liberally construed.

St. Louis, Iron Mountain & Southern R'y vs. Loftin, Collector.

That the Cairo and Fulton Railroad Company was duly organized in accordance with the charter and franchises given, and under consolidation with other railroad companies still continues to exist with its franchises still unimpaired.

That, subsequently, on the 9th of February, 1853, the Congress of the United States granted to the corporation the right of way through the public lands, through which the contemplated road was to pass; and also granted to the State of Arkansas for the purpose of aiding in making said road, every alternate section of land, distinguished by even numbers, for six sections in width on each side of said road, and giving to the road other lands in lieu of those sold, or held by pre-emption, on even sections, to be selected on either side of the grant, within fifteen miles from the road bed, with a proviso that the lands so granted should be applied in the construction of the road, and should be disposed of only as the road progressed, and then to be applied to no other purpose whatever. That these lands were granted by the Congress of the United States to the State of Arkansas, subject to the disposal of the Legislature thereof, but only a quantity not exceeding 120 sections, included in a continuous length of twenty miles of said road, might be sold. And that, if the road should not be completed within ten years, no further sale should be made, and the lands should revert to the United States.

That, by a subsequent act of Congress, approved July 28th, 1866, the land grant was renewed, and made subject to the same use and trust as provided in the original grant.

That the State of Arkansas, by an act of the General Assembly, approved January 16th, 1855, granted these lands to the Cairo and Fulton Railroad Company, to aid the company in the construction of the road, and that the grant was accepted by the company.

That said company completed and equipped the road within the time prescribed by law, and made the same a first class road.

That the conditions of the grant have been complied with, and the title to the lands absolutely vested in the company.

That it was on the security and value of said grant of lands, in the exemptions made to the same, that the means were acquired for building and equipping the same ; that the total cost of said railroad and equipments was about $11,157,000.

That the amount raised by subscription and applied to that purpose, and all amounts received from every source, except that of the lands, did not exceed the sum of $300,000 ; that the available assets of the company consisted of said lands ; that it was only through these land grants that the company was enabled to build and equip the road, having no credit except such as was based upon the lands, and no other property out of which money could be raised for that purpose.

That long before the road was built, the Legislature of Arkansas passed several acts to exempt the property of the company from taxation.

That the act of incorporation, approved January 12th, 1853, *provided,* That the capital stock and dividend of said company should be forever exempt from taxation, and that the road, fixtures and appurtenances should be exempt from taxation until after it paid an interest of not less than ten per cent. per annum, and that so much of the Mississippi Valley railroad charter as was consistent with, and did not limit the charter of the Cairo and Fulton company, should be taken as part of said charter.

That by the act of 16th January, 1855, it was provided "that after the expiration of twenty years from the completion of the Cairo and Fulton road, the company should pay into the State treasury an annual tax upon the road, fixtures, lands, tenements, and houses, equal to that paid upon other taxable property in

## NOVEMBER TERM, 1875. 699

St. Louis, Iron Mountain & Southern R'y vs. Loftin, Collector.

this State for the time being ; and for the purposes of taxation, the road, fixtures, lands, tenements and houses, shall be considered separate and distinct from the capital stock, whether all of the capital be expended in building said road, fixtures, houses and tenements, or not, and the capital shall be exempt from taxation, as provided for in the eleventh section of the Cairo and Fulton railroad charter.

And that by a subsequent act of said Legislature, approved November 26th, 1856, it was *provided*: That after the road was completed, and shall have declared a divided of ten per cent. per annum upon the capital stock of said company, then, and in that event, said company shall pay to the State Treasurer, two and one-half per centum upon the net proceeds annually.

Plaintiff says that twenty years have not elapsed since the the completion of the road ; that it was not completed until January 15th, 1874. That the road never paid an interest of ten per cent. per annum on the investment wherewith it was built, nor has it declared or paid a dividend of ten per centum on its capital stock ; nor has it declared or paid any interest or dividend whatever.

That for the purpose of raising money with which to build and equip the road, the company has issued its bonds, for the sum of eight millions of dollars, payable first of January, 1891, with interest which remains unpaid.

That by an act of the General Assembly of Arkansas, April 8th, 1869, plaintiffs were required to list their lands, and did so, but by the provisions of this act the lands were not to be taxed.

That under the laws of Arkansas and Missouri, the Cairo and Fulton Railroad Company was consolidated with the St. Louis Iron Mountain Railroad Company, under the name of the St. Louis, Iron Mountain and Southern Railway Company, under which name plaintiff sues.

That defendant is about to sell the lands so granted, without authority of law.

And prays that he be enjoined from doing so.

This is the state of case made by plaintiff, and which we have set forth at more than usual length, because the questions of law to be determined arise upon the sufficiency of the allegations in the bill, to entitle plaintiff to the relief sought.

It may, at the outset, be well to remark that the provisions of the act of January 16th, 1855, to which plaintiff has made reference in his bill, was repealed by the 8th section of the act of November 26th, 1856, and that so much of the act of April 8th, 1869, as exempted all the lands, so granted, from taxation, was repealed by an act of the General Assembly of the State, approved November 30th, 1875.

The first section of this act provides, that the assessors in the different counties of this State shall, at the time he assesses the personal property in his county, in the year 1875, assess and place on the tax book of his county, under the same rules and restrictions as are required in assessing land in this State, all the land in his county heretofore donated, granted or given to any railroad or railroad company, where the title to the land has passed from the United States government.   And said land shall be thereafter assessed and taxed as other lands in this State.

Sec. 2.   That all laws, and parts of laws, in conflict with this act be and the same are hereby repealed.   And that this act take effect and be in force from and after its passage.

It is under this act that a tax was levied, and to restrain the collection of which this suit was brought.

All the acts by which these lands were exempted from taxation, except the 11th section of the act of 12th January, 1853, under which the charter was granted, were repealed.   They were mere voluntary acts of exemption, which did not bind future legislatures.

St. Louis, Iron Mountain & Southern R'y vs. Loftin, Collector.

The power of taxation is sovereign and inherent in the government, to be exercised by the legislative department, and extends over all property not expressly exempted from taxation by positive legislative enactment. The existence of the government depends upon its existence.

The amount necessary to be levied for the support of government must depend upon contingencies not to be anticipated, and unless under peculiar and exceptional circumstances, and upon an adequate consideration, can never be made obligatory upon succeeding legislatures, upon whom the responsibility rests, to supply the necessary revenue for the support of the government.

"The General rule," says Mr. Cooley, "is, that one legislative body cannot, by its own action, narrow the scope of legislative powers ; but with the amplitude that it comes to the one body, it must pass to the successor ; pledges therefore or stipulations by one legislature regarding the future levy of taxes, though they may under some circumstances charge the conscience of their successors, are not limitations on legislative power, but may be observed or disregarded, as it shall be thought the public necessity, or policy may require." Coody on Taxation, page 52 ; 22nd Wallace, 375 ; 48 Mo., 287.

The eleventh section of the charter, which contains the exemption, stands upon different grounds. It was a public act, so declared, and the charter was, doubtlessly, granted upon a supposed benefit to the State, and, in the estimation of the legislature that granted the charter, the general benefit and advantage to the state, were taken as a sufficient consideration for the exemption.

The eleventh section of the charter provides that the "capital stock and dividends of said company shall be (forever) exempt from taxation ; the road, fixtures and appurtenances shall be exempt from taxation until after it pays an interest of not less than ten per cent. per annum."

St. Louis, Iron Mountain & Southern R'y vs. Loftin, Collector.

The question at issue is, was the land subsequently granted to aid in the construction of the road, part of the capital stock of the company, in the sense contemplated by the Legislature at time the charter was granted? If it was, then the taxation of the land should be restrained, if not, the bill is demurrable, and the taxes should be collected.

Numerous adjudicated cases have been cited by counsel on both sides, tending to show what the courts have held to be "capital stock," and exempted under the general terms "capital stock," and after a most careful examination of all of them, we have found them but remotely bearing upon the question at issue. Several of the cases referred to, were made under statutes which were passed after a land grant had been given, and in some instances, the grants were conferred under acts of Congress much like that passed to aid the Cairo and Fulton road.

And, it is worthy of observation, that in all, or nearly all of the cases where grants were made to the State to aid in the construction of roads, that either in the act of the Legislature accepting the grant, or in the act donating it by the State to the corporation there were contained exemptions of the lands so granted for a limited period, at the expiration of which, the lands were to be taxed. And the Legislature of Arkansas did, in the act of 16th January, 1855, in express terms, separate the road, fixtures, appurtenances and the lands from the capital stock, and the time of exemption after which the whole of the property should be taxed as other property in the State, and in contradistinction declared that the capital stock, exempted in the eleventh section of the charter should forever remain exempt from taxation. This act was repealed, but for which it would have settled the question at issue. It however leaves no doubt whatever as to what the legislature intended when the grant was made by the State to the corporation.

The act of 1855 was fuller and more explicit than most of the legislative acts of the other states, where like grants have been disposed of.

In the first section, it was provided: "That after the expiration of twenty years from the completion of the said Cairo and Fulton road, said company shall pay into the State treasury an annual tax upon the road, fixtures, lands and tenements, and houses, equal to that paid upon other taxable property in this State, for the time being; and for the purpose of taxation, the road, fixtures, lands, tenements and houses, shall be considered separate and distinct from the capital stock, whether all the capital stock shall be expended in building said road, etc., or not."

And the "capital stock" shall be exempt from taxation as provided for in the eleventh section of the charter.

Taking this act as an expression of legislative will it is evident, that the lands were not granted to the corporation as a part of its capital stock, but on the contrary, were in express terms, distinguished from it, but we have seen that this act is not in force, nor is there any act whatever in force exempting the lands so granted to the railroad company from taxation, for any period whatever.

It is alleged by plaintiffs in their bill that they accepted all of the several acts of the Legislature, including that which repealed the act of 1855.

There is a class of cases referred to, where questions growing out of the construction of charters, and the legislative acts, accepting the Congressional grant, and in disposing of it, to which we will refer.

In the case of *State* v. *Duette, et al.*, 48 Mo., 282, the question arose upon the construction of the charter.

It was provided in the charter: That the capital stock, together with the machines, cars, works and other property, should

vest in the stockholders, be deemed personal property, and be exempt from all public charges or taxes whatever for five years. After this, an act accepting a land grant from the United States was passed to aid in the construction of the road, in which it was provided: That the Pacific railroad, and the Southwestern Branch railroad shall be exempt from taxation, respectively, until the same declare a dividend; when the road bed, buildings, machinery, engines and cars of such completed road, at the actual cash value thereof, shall be subject to taxation, at the rate assessed by the State, on other real and personal property."

By the act of 1851, all property of the corporation was exempt for five years. Under the act of 1852 the property of the road was exempt until it was opened, put in operation and declared a dividend.

Under this state of case, no question could arise as to what was included in the terms "capital stock."

In the case of *City of St. Joseph* v. *Hannibal and St. Joseph Railroad Company*, 39 Mo., 476, the question presented was, whether a charter of the company which exempted the stock of the company from taxation for state and county purposes, was not a prohibition upon the legislature to pass an act to tax the property thus exempted. A tax was levied for corporation purposes. It was held that it did not, and, that the levy of such city tax was not double taxation.

In the case of *Hannibal and St. Joseph Railroad Company* v. *Shackelford*, 30 Mo., 580, the question was, whether property of the company, consisting of road-bed, depot, cars, locomotives, and all the real and personal property necessary for the operation of the road, was liable to taxation under the general revenue laws of the State. The law provided that all property owned by incorporated companies, over and above their capital stock, should be taxed. The charter, granted in 1849, provided that

the stock of said company "should be exempt from all state and county taxes." On the 20th September, 1852, an act was passed to donate to the company the lands that year granted to the State, for the purpose of aiding the company to build the road. The third section of the act *provided*: That in consideration of the grants and privileges conferred on said company, it shall, in December of each year after said road is completed and declares a dividend, pay a tax * * * * on the road bed, cars, etc., and other property of the company.

By an act of 28th December, 1852, passed for the purpose of applying a portion of the donation of Congress to the Pacific road, it was provided: The said Pacific Railroad and the Southwestern Branch Railroad shall be exempt from taxation until the same shall be completed, opened and in operation.

Under the provisions of these several acts, the question arose as to whether the road bed, machinery, depots, and other property used by the company in operating the road, were to be considered part of the capital stock of the company.

No such question is presented in the case before us. No levy or attempt to levy upon the road bed, fixtures and appurtenances, of the St. Louis, Iron Mountain and Southern Railway, has been made, but only upon the lands granted to the company to aid it in the construction of the road. No such question was presented before Judge Naptan as that before us. He refers to the several acts of the State of Missouri in which it is declared that the road bed and machinery should be deemed part of the capital stock, and vested in the shareholders forever.

We have no such statute in Arkansas, and there is not a sentence in the opinion in that case, which would aid us in the determination of the question as to whether the subsequent land grants given to aid the company to build the road, were or not, part of the capital stock of the company, and held as such under

*Vol. xxx.—45.*

its charter. Indeed, the legislature, not only of Missouri, but of the other states in which land grants have been donated, negative the presumption that the grants were to be so considered; on the contrary, we find the legislature, in the acts accepting the grants or in conferring them upon the corporations, limiting and fixing the time when these grants shall be subject to taxation.

In the case of *Trask* v. *McGuire*, 18 Wallace, 391. The St. Louis and Iron Mountain Railroad Company was incorporated March 3d, 1851. The capital stock was $6,000,000. And it was provided in the act that the stock of said company should be exempt from all state and county taxes.

On the 17th February, 1853, it was enacted that the engines, cars, machinery, and other property belonging to said company, should be deemed a part of the capital stock of the company, and vest in them forever. The state, subsequently, gave aid to the company, issued bonds which were used by the company, and were, by contract, to operate as a mortgage upon the road of the company, in favor of the State.

The question at issue arose upon the effect of the sale by the State under its mortgage. But there is this pregnant inference to be drawn, that but for this act, declaring the road fixtures and property of the company "capital stock," it would not have been held as such.

Several cases have been cited by counsel to show that the exemption of capital stock from taxation exempted only the stock and property which were necessary to carry on the business of the corporation, and that lands, or other property not necessary for that purpose, was not exempt from taxation. Of these, in the case of *Vermont Central Railroad* v. *Burlington*, 28 Verm., 193, the charter of the road exempted the stock, property and effects of the company from taxation. Lots of land outside of the road bed grant were assessed for taxation: Held, that the exemption

St. Louis, Iron Mountain & Southern R'y vs. Loftin, Collector.

was limited to such real estate as the company were authorized to take *in invitum*.

In *2d Municipality of New Orleans* v. *Commercial Bank*, 5 Rob., 151, the capital stock of the bank was exempted from taxation during the continuance of the charter: Held, that nothing was exempt from taxation except the capital stock of the bank, $3,000,000, furnished by the stockholders for its operation.

In the *Milwaukee and St. Paul Railroad Company* v. *The City of Milwaukee*, 34 Wis., 271, the road trunk, right of way, depots, buildings, workshops, rolling stock, and all other property necessarily used in operating the road, were exempted: Held, that all the lots or parcels of land necessarily used by the company for its repair shops, yards or depot grounds, were exempt, but that dwelling houses, and lands occupied for other purposes, were not exempt.

In *State New Jersey Railroad Company* v. *Collectors of Wards of Newark*, 1 Dutcher, 315 : Held, that real estate owned by the railroad company, not used or occupied for the necessary purposes of the company, is liable to taxation, notwithstanding the corporation pays a tax on its capital stock.

In *Bailey, collector,* v. *Clark et al.*, 21 Wallace, 284: Held, that the term "capital" does not include money borrowed from time to time in the course of business, but it applies only to the property, or money of the banker, set apart and manifestly invested in banking.

In *New Haven* v. *City Bank*, 31 Conn., 106 : The capital stock of the bank was, by its charter, exempt from taxation. A house was bought with the capital of the bank. The court seem to attach importance to this fact, and held, that as it was used by the bank, it should be exempt.

Giving to these decisions (several of which were made by courts of the highest authority) due consideration, they will be

found to lead to no very satisfactory solution of the question at issue in the case under consideration, to determine which a reference to the charter, the purposes for which it was granted, the subsequent grant of lands to aid in building the road, and the conditions attached to the grant, may lead to more satisfactory conclusions.

The act of January 12th, 1853, was passed to incorporate a joint stock company, which is defined by Angel and Ames, p. 539, to be "a corporation which has for its object a dividend of profits among its stockholders. A corporation of this sort is invariably empowered to raise a certain amount of capital by the mutual subscription of its members, and this capital is divided into shares, which vest in the subscribers, according to their respective contributions."

"The stock of a railroad company," says Mr. Justice Ingles, in *State* v. *Wood*, 15 Richardson, 185, "is the aggregate of the property and effects of the company. In its original form, it is a sum of money contributed in fixed proportions of the adventure."

All of the necessary requisites to create and organize a joint corporation are found in the three first sections of the act of incorporation of the Cairo and Fulton company. The 4th section provides that the capital stock shall be $1,500,000, divided into shares of $25 each, which are declared to be personal property, which may be assigned and transferred in such manner as the board of directors may order, with power in the board, upon its requisition, to require payment of the sum subscribed, and requires the board of directors to open a book for the subscription of stock.

The 9th section provides, that the corporation may commence the construction of the road at any time after $100,000 of capital shall have been subscribed, and five per cent thereon paid to the board of directors.

The 11th section provides, that the capital stock and dividends of said company shall be (forever) exempt from taxation. The "capital stock" declared to be forever exempt from taxation was evidently the joint stock capital provided for in the preceding sections of the act, and that capital stock was a cash capital, to be raised by subscription (in the first instance), subscribed stock, to be paid in cash upon the call of the board of directors. That the money subscribed was not to be paid in at the time when it was subscribed was contemplated, but the subscribers bound themselves to pay, when called upon, in such sums as the necessities of the corporation required, and hence the terms of description, "subscribed stock," and "paid in stock."

This was the character of the stock intended to be exempted from taxation. There was no other capital stock, under the provisions of that charter; there could be no other stock. This stock was to be *forever* exempt from taxation. The road and appurtenances were also to be exempt until it yielded a certain per cent. upon the capital invested in making and equipping the road. The reason for this distinction is obvious. The capital was to be invested in building the road. It was subscribed and set apart for that purpose. And was intended to be absorbed, and taken up in the road. It was not an active continuing capital, such as is required for banking purposes, or for insurance corporations. Corporations of this kind are expected to keep a large amount of capital on hand.

It is the capital thus held and used which yields the dividend. But in railroad corporations the capital is raised to be expended at once in building and equipping the road, and, when the road is completed and put in operation, it is the road under its franchises, which produces the dividend. It was evidently in contemplation of this fact that the "capital stock" raised to be so expended, was exempted from taxation. And so with regard to the road, when put in operation with its equipments. The

exemption of these, the proceeds of the capital, was not to pay any tax until it yielded a profit of ten per cent. per annum on the amount invested in building and equipping it.

It is contended for plaintiff that the land granted by Congress to aid in the construction of the road, is also a part of its capital stock, and covered by this exemption. A construction which lets the land in as part of the capital stock, is altogether inconsistent with the theory that the capital is to survive the building of the road. The land is a realty, never to be exhausted or removed. The true intent of the grant was that the lands should be sold, should pass into other hands, and according to their real value, to remain like other lands, a perpetual source of revenue to the State. An express provision was made for the sale of the land as each twenty miles of the road were built. It was the money arising from the sale of the lands, *not the lands*, which was to be applied as part of the capital to be used in building the road, and thus become absorbed in it; such could not be the case with the land. It was perpetually to retain its identity, its ownership too was to remain, either the property of the corporation or of others. At the time the charter was granted no land grant had been made, no reference to it is made in the charter, no place for it as capital stock or otherwise. It was a money capital provided for, to be raised by stock subscription. The money arising from the sale of the lands might be used as part of the capital appropriated for that purpose, and exempted from taxation, but not the land.

It could not have entered into the minds of the members of the Legislature, that when they were providing for the exemption of the *cash capital* of the corporation, to be used in building the road, and soon to be thus expended, that they were at the same time *forever* exempting several millions of acres of land extending north, south and west, through the heart of the State. No

presumption can be raised from either declaration or purpose, to encourage the belief that such was their intention.

It is a settled rule that no presumption in favor of exemptions of property from taxation, can be indulged.

The exemption must be made upon a sufficient consideration and be clearly shown to exist, and no presumption can be indulged in its favor.   Cooley on Taxation, p. 52.

In the case of *Tucker* v. *Ferguson*, 22 Wallace, 575, Mr. Justice Swayne, who delivered the opinion of the court, said: "The taxing power is vital to the foundations of government; it helps to sustain the social compact and to give it efficacy.   It is intended to promote the general welfare.   It reaches the interest of every member of the community.   It may be restrained by contract, in special cases, for the public good, when such contracts are not fordidden.   But the contract must be shown to exist.   There is no presumption in its favor; every reasonable doubt shall be resolved against it.   Where it exists it is to be rigidly scrutinized, and never permitted to extend, either in scope or duration, beyond what the terms of the concession clearly require.   It is in derogation of public right, and narrows a trust created for the good of all."

The rule thus laid down by Mr. Justice Swayne is fully sustained by authority, indeed there is none to the contrary, and when applied to the case before us, is in effect decisive of the question at issue.

The manifest injustice of permitting so large an amount of real estate (for all time to come) to be exempt from taxation, and as a consequence, to impose the whole burden of taxation (from that source) upon the lands not so exempted, repels the presumption that such was the intention of the legislature, which, when considered in connection with the several provisions of the act of incorporation, and the language used, renders it improbable that the lands so granted were intended to be embraced in.

the terms " capital stock," but if it should be a matter of doubt, whether such was the intention of the legislature, under the rule laid down above, we should be constrained to hold that the lands were not intended to be exempted from taxation.

And we think that this construction of the provisions of the charter is strengthened by the terms of the grant, its purpose, and the limitations imposed upon its use by congress.

This grant of land was made to the State of Arkansas in trust, to be disposed of by the legislature of the State, to aid the corporation of the Cairo and Fulton Railroad Company in the construction of its road.

There appears to have been no formal acceptance of the grant by an act of the legislature, as was the case in several of the states to which like grants of land were given.

But on the 16th of January, 1855, the legislature, by legislative enactment, transferred the lands so granted, to the Cairo and Fulton Railroad Company, under all the limitations, and restrictions, imposed by the act of congress.

That part of the act of the legislature which conferred upon the Cairo and Fulton Railroad Company the grant of land, is as follows :

Section 1. That the lands within this State along the entire length of the Cairo and Fulton railroad * * * with the rights conferred by the act of Congress of selecting other lands in lieu of such as may have been sold or otherwise appropriated by the United States, * * * approved February 9th, 1853, are hereby granted to the Cairo and Fulton Railroad Company, so that they may be legally applied in aid of the construction of said main trunk line of said road, separately from either of said branches thereof.

And by an amendment to the act of January 16th, 1855, approved November 26th, 1856, it was expressly provided that the

lands granted, were to be taken and held subject to all the conditions, limitations and restrictions contained in the act of Congress granting said lands in trust to the State.

By the 1st section of the Act of Congress, a right of way one hundred feet wide, on each side of the survey, along its whole length was granted over the public land of the United States.

The second section granted to the State of Arkansas, for the purpose of aiding in making the railroad and branches, within their respective limits, every alternate section of land designated by even numbers, for six sections in width, on each side of said road and branches, or if such even numbers or parts thereof have been appropriated by the United States, then there is to be selected by agents appointed for that purpose by the Governor of the State, from the lands of the United States most contiguous to the tier of sections above specified, so much land in alternate sections or parts of sections, as shall be equal to the amount of land disposed of by the United States, which lay within the grant. The State of Arkansas shall have and hold to and for the use and purpose aforesaid; *provided,* That the land hereby granted shall be applied, in the construction of said road, and shall be disposed of, only as the work progesses, and shall be applied to no other purpose whatsoever,

The 4th section provides, that the said lands, hereby granted to said State shall be subject to the disposal of the Legislature thereof, for the purpose aforesaid and no other.

Section 5. That the lands hereby granted to said State, shall be disposed of by said State, only in the manner following: That is to say, a quantity of land, not exceeding one hundred and twenty sections and included within a continuous length of twenty miles of said road, may be sold; and when the Governor of said State shall certify to the Secretary of the Interior, that twenty continuous miles of said road is completed, then another like quantity of land hereby granted, may be sold; and so from

time to time until the road is completed, and if said road is not completed within ten years, no further sales shall be made, and the lands unsold shall revert to the United States.

Such was the grant, and such the restrictions placed upon its use. It was a delegated trust conferred upon the State to be exercised under the limitations imposed, and for a particular purpose. The State, by its Legislature, was vested with power to dispose of this trust, and the grant was turned over to the corporation to be executed under all the limitations and restrictions imposed by the act of Congress.

After the most careful consideration of this grant, the limitations upon it, and the time and circumstances under which sales, from time to time, were to be made, we are unable to find anything in it which, even remotely, tends to show that the lands were intended to be taken and held as capital stock, or that they were to be held up and reserved to the corporation from sale.

With regard to the proper construction to be given to the act of Congress, and of the rights and duties of the State, and of the corporation for whose benefit the grant was made, we are aided in our investigation by a recent decision of the Supreme Court of the United States. *Tucker* v. *Furgerson*, 22 Wallace, 527.

The act of Congress which granted land to the State of Michigan, to aid in the construction of Flint and Pere Marquette Railway Company, is almost a literal copy of the act granting aid to the Cairo and Fulton company, and the questions presented for the consideration of the Supreme Court of the United States were, in many respects, like the one we are considering. The object of the suit in that case, as in this, was to enjoin the imposition of a tax upon the land granted to aid in the construction of that road. The opinion of the court was delivered by Mr. Justice Swayne, and is so clearly in point that we cannot

but indulge in quoting from it, so far as it relates to the grant of land, and the proper construction to be placed upon it. He says: " The United States granted the lands to the State for a specific purpose. That purpose was to aid in the construction of railroads upon the routes designated. The land was made subject to the disposal of the Legislature, for the purpose aforesaid, and no other. Congress prescribed certain safeguards to secure their application to the construction of the roads, and to prevent failure or diversion. The precautions were few and simple. Except as to the first 120 sections, the power of sale was to attach only as the road was completed in successive sections of twenty miles each.

It is a conclusive answer to the proposition we are considering, that the United States has no more claim, legal or equitable, touching the land here in question, than it has to lands which they have patented and sold to others, in the regular course of the administration of the land department of the government; and that, as Congress has not seen fit, either expressly or by implication, to impose any restrictions upon the taxing power of the State, that subject was remitted, as under the circumstances it might well be, wholly to her wisdom and discretion. * * Upon general principles, the State could not tax the land while the title remained in the United States, nor while she held them as trustee of the United States. But when the State, proceeding in the execution of her trust, had transferred her entire title to the company, and they had perfected their title and acquired the right to sell, the case assumed a very different aspect."

What was that different aspect? Most clearly it was that the title to the land had vested in the corporation. It was from that day that the right of taxation was to commence, and in no wise depended upon the sale of the land. The corporation had from that day an indisputable right to sell. It was contemplated by the terms of the grant that it should sell the lands, and vest the

proceeds of the sale in building the road. And at the same instant that the United States was divested of her title, the exemption of the lands belonging to the United States within the limits of the State, reserved to the United States from taxation as a condition upon which the State was admitted into the union, and the corporation took the title, the lands became (unless specially exempted) liable, as all other lands of the State were, to taxation. "The company," says Mr. Justice Swayne, "so far as the matter or right is concerned, were upon a footing with all other aliencies of the United States. The imposition of taxes can in no just sense be said to be a diminution of the value of land. If Congress had thought so, they would have forbidden it. Liability to taxation is an incident to all real estate. Exemption is an exception; when claimed, to be effectual, it must be made out."

Yielding our assent to the correctness of this decision, we must hold that the right of taxation of the lands does not depend upon the fact as to whether the corporation had, or not, parted with the title. It is a matter of no moment to the State who the owner of the land may be, that it is land, the title to which has been parted with by the United States, is all that is material to be seen. The tax is upon the land, and the right of taxation accrued to the State, from the time the United States parted with it, unless exempted under the act of 1869, until it was repealed by the act of 1875.

The question as to whether plaintiff has, or not, parted with the land, is not before us, there is no allegation showing such sale. If such had been the case a different question might arise, but it is alleged that one million four hundred thousand acres of the land remain unsold.

It is true that there is an allegation that it was the security and credit given the company as the owners of the grant of land,

St. Louis, Iron Mountain & Southern R'y vs. Loftin, Collector.

with the exemptions claimed, that enabled it to raise the means to build and equip the road. And, that in order to raise money for that purpose, the company issued its bonds for the sum of eight millions of dollars, dated on the 10th December, 1870, and payable 1st of January, 1891, at the office of the Union Trust Company, in the city of New York, with interest, and that the debts remain unpaid. But this is no averment of a sale of land, or even an incumbrance upon it. The title must be considered as remaining in the company.

More than twenty years have elapsed since this grant was made, by force of which these lands have been exempted from taxation, and, until within a few years, also from sale or settlement, because the company had failed to build the road and put themselves in a position to receive the title, and by reason of which a wealth of revenue and population has been lost to the State.

Counsel for plaintiff assume that since the road has been completed, the lands will soon be sold, from which time they will be subject to taxation.

Whether this will be the case or not, is foreign to the question at issue, the right *now* to tax the lands.

If exempt *now*, they are, according to the terms of exemption, *forever exempt*.

The company will, or not, at their pleasure, dispose of the land. In a financial point of view, if the money for which the land is sold is worth more at interest than the increased value of the land will be if held up from sale, they will likely be sold. The company will sell or not, as may seem best, and the exemption, if allowed, will enter largely into the consideration, whether the lands are to be sold or reserved from sale. If held for mining purposes, or for purposes of cultivation, the exemption of the land will carry with it an exemption of all fixtures and improvements placed upon them.

A question of more importance to the future prosperity of the State, or one in which the burden of the support of the State government could be more inequitably distributed, has rarely, if ever before, been presented for the consideration of any court. But whatever the decision of the court may be, or however detrimental to the interests of the State, if the legislature has made a valid exemption of the lands, one which is to bind future legislation, and which fixes a perpetual exemption from taxation, the court,, without reference to the consequence which may result from so holding, should sustain the exemption and declare it valid.

The plaintiff has expended a large amount of capital in building and equipping the road, and it will require energy, and close attention to make so large an investment remunerative. The amount claimed to have been expended exceeds $11,100,000, but it has been seen that this large investment is, by the second clause of the exemption act, to be exempt from the payment of taxes until the road yields ten per centum per annnm on the amount expended in building the road and equipping it. Unless this per cent. is realized, there is unquestionably no tax to be collected from this source, and if, in addition to this, we should sustain the claim of plaintiff to an exemption of one million four hundred thousand acres of land, as *capital*, it would amount to a double exemption. The one, capital remaining after the road has been for more than two years completed; the other, the products of the capital stock, or, as contended by plaintiff, of money loaned upon the credit that the corporation was the owner of the lands, and that they were not liable to taxation.

After a careful consideration of the case in all its bearings, we have been led to the following conclusions :

That the several statutes passed by the Legislature, which exempted, or claimed to have exempted, the lands granted by Congress to aid in the construction of the road, from taxation (except the 11th section of the charter) were voluntary enactments,

which the Legislature had a right at any time to repeal, and that they have been repealed.

That the capital stock exempted from taxation by the 11th section of the charter was the cash capital provided for in the 4th section of the charter, and not land.

That the land granted by Congress to aid in the construction of the road was not part of the capital stock of the road, nor exempt from taxation.

That when the United States parted with its title to the land, and the same became the property of the corporation, the right of the State, in her sovereign capacity, to tax the land accrued, irrespective of sale or transfer by the corporation. That the State of Arkansas, when she repealed the act of 1869, which exempted these lands from taxation, resumed her right of taxation, and had, under the provisions of the act of 1875, and the act of the general laws in reference to the levying and collecting taxes on land in this State, a right to levy and collect such taxes and was in the proper exercise of this power through her officers, and should not be restrained in its exercise. And that the demurrer to the bill was properly sustained.

Let the judgment and decision of the Circuit Court of Jackson county be in all things affirmed.