McConnell v. Arkansas Brick & Manufacturing Company.

Opinion delivered May 17, 1902.

1. AGENCY—AUTHORITY OF OFFICERS TO BIND STATE.—The state is liable only to the extent of the powers actually given to its officers, and not to the extent of their apparent authority; and all who deal with a public agent must at their peril inquire into his real power to bind his principal. (Page 577.)

2. CONTRACT—LEASE OF CONVICTS—INDEFINITENESS.—A contract for the lease of convicts, entered into by the board of penitentiary commissioners, by which the board agreed to furnish 300 able-bodied men on demand of the lessee, who undertook to work never less than 150, is not so indefinite as to be unenforceable. (Page 578.)

3. LEASE OF CONVICTS—VALIDITY.—Under Sand. & H. Dig., § 5499, providing that "until adequate provision be made by the general assembly for the confinement and employment of convicts within the walls, said board [of penitentiary commissioners] shall cause to be employed the excess of convicts at labor outside the walls, either under the contract or state account system, under such regulations, conditions and restrictions as it may deem best for the welfare of the state and the convicts," a contract for the hire of a certain number of convicts, entered into by the superintendent and financial agent of the penitentiary and approved by the board of penitentiary commissioners, is not *ultra vires* because it is to run for ten years, a period longer than the term of office of any of the officers who entered into the contract on the part of the state. (Page 579.)

4. CONSTITUTIONAL LAW—SUIT AGAINST STATE.—A suit to enjoin the superintendent of the penitentiary and the board of penitentiary commissioners from rescinding a contract for the hire of state convicts and to require the superintendent to proceed with the execution of the contract is not a suit against the state where the state has not, by act of the legislature, made herself a party to the refusal to perform the contract. (Page 582.)

5. CERTIORARI—BOARD.—The board of penitentiary commissioners is not a *quasi* judicial tribunal whose errors may be reviewed on certiorari. (Page 588.)

6. INJUNCTION—RELIEF.—Injunction is the proper remedy to prevent the board of penitentiary commissioners from unlawfully rescinding a valid contract for the lease of state convicts. (Page 590.)

Appeal from Pulaski Chancery Court.

THOMAS B. MARTIN, Chancellor.

Affirmed.

*Morris M. Cohn, T. H. Humphrey* and *Kirby & Carter,* for appellants; *George W. Murphy, Attorney General,* of counsel.

The decree is too vague and ambiguous to be enforceable. 123 U. S. 443; 105 Fed. 459; 117 U. S. 52, 71; 31 S. E. 191, 192. An injunction is not grantable where it could not be enforced. 3 Pom. Eq. Jur. §§ 1341, 1405; High, Inj. § 731; 96 Ill. 503, 512; 31 Mich. 43, 52; 2 Ch. Cont. 1467; 33 Mich. 331; 31 Mich. 43, 52; 38 Ohio St. 24. Certiorari and not injunction was the proper remedy, if any remedy existed at all. Sand. & H. Dig., § 1125; 62 Ark. 196, 201; 1 Saxt. 282; 25 N. J. Eq. (10 C. E. Gr.), 295; 77 Am. Dec. 272; 23 Cal. 302; 16 Cal. 208; 5 Barb. 43; 67 Me.

429; 70 Me. 317; 26 Vroom, 495; S. C. 27 Atl. 803; *id.* 807; S. C. 26 Vroom, 503; 34 Wis. 497. A suit cannot be instituted against an officer merely to ·evade the rule forbidding suits against the state. Mech. Pub. Off. § 836; 4 Wall. 475; 92 U. S. 531; 109 U. S. 446; 123 U. S. 443, 498-502. The suit was not maintainable because it was, in effect, a suit against the state. 2 Ark. 504; 46 Ga. 350, 359; 31 S. E. 191, 192; 109 U. S. 453; 106 U. S. 196; 123 U. S. 443, 487; 106 U. S. 244, 245; 114 U. S. 311; 117 U. S. 52; 92 U. S. 531; 108 U. S. 76; 107 U. S. 711; 3 Wood, 426; 117 U. S. 71, 59; 123 U. S. 488; 109 U. S. 446; 123 U. S. 507, 508; 140 U. S. 18; 105 Fed. 459; 31 S. E. 191; 96 Ill. 503; 78 Ia. 97; S. C. 42 N. W. 593; 42 N. W. 594; 1 Ia. 201; 13 Barb. 438; 76 Va. 456; 33 La. Ann. 504; 22 Tex. 31. The state, being directly interested in the contract and a party to it, was a necessary party to the suit. 20 Ark. 615; 2 Ch. Cont. 1442; Pom. Spec. Perf. § 482; 32 Ark. 297; 34 Ark. 291; 41 Ark. 270; 123 U. S. 489. *Cf.* 96 Ill. 510, 512. The alleged contracts are too indefinite and vague to be enforceable by a court of equity. 63 Ark. 100, 105; 3 Ark. 18, 57; 60 Ark. 487; 28 Cal. 635; 46 Pa. St. 334; 7 C. E. Gr. 85; 27 Cal. 451; 31 Mich. 43, 52; 32 Mich. 64; 33 Mich. 331; 17 S. & R. 39; 13 S. & R. 45; 38 Ohio St. 24, 31; 96 Ill. 503, 507; 96 Ill. 507, 512. The court will take judicial notice of the number of convicts in the penitentiary. 4 Ark. 302, 367; 37 Ark. 574, 577, 578; 152 U. S. 211; 72 Fed. 46; 72 Me. 104; 6 Mont. 379; 12 Pac. 851; 9 New Mex. 611; S. C. 58 Pac. 398; 39 Fed. 66; 61 N. Y. S. 263; 137 U. S. 202, 216. *Cf.* 27 Ark. 266, 278; 33 Ark. 17; 40 Ark. 200; 4 Ark. 302, 367. The alleged contracts are unreasonable, and the plaintiff below is in no position to invoke relief. The allegation of the complaint as to good faith and fairness are not admitted by the demurrer. 51 Mich. 446; 102 Ill. 655; 55 N. H. 36; 3 So. 80; 72 Ga. 423; 21 Wall. 430; 30 Ill. App. 17; 12 Gray, 280; 2 Ark. 260. The contract was made by the virtue of the grant of power in section 5525, Sandels & Hill's Digest, and it must be strictly pursued. Mech. Pub. Off. § 511; 39 Ark. 550; 38 Ark. 601, 604; 25 Ark. 267; 58 Ark. 270, 275; 180 U. S. 587, 598-600; 58 Ark. 270, 275; Tied. Lim. Pol Pow. 100, 101, 118, 121. The alleged contracts were beyond the power of the superintendent, the board or the financial agent, because for a time in excess of their official term. Mech. Pub. Off. § 509; Sand. & H. Dig., §§ 5511, 5517; 66 Ark. 466; 3 Vroom,

478; 28 N. J. L. 244; 123 Ind. 148; S. C. 7 L. R. A. 160; 18
L. R. A. 447; 16 L. R. A. 257; 43 Kan. 643; 5 Jones, Law, 98;
51 Mo. 21; 50 Kan. 350; 43 Ia. 140; 84 Mich. 391; 87 Ill. 255;
92 Ill. 294. Cf. 44 Ark. 273; 30 Ark. 693; 146 U. S. 387, 452;
134 U. S. 99, 106; 100 U. S. 548, 559; 115 U. S. 650; 18 Wall.
206; Cooley, Const. Lim. 282-3; 180 U. S. 587, 597; id. 624; 7
So. 409; 178 Ill. 299, 313; 1 Dill. Mun. Corp. § 97; 45 Cal. 637,
638; 43 Kan. 643; 43 Ia. 140; 4 Dutch. 244; 85 Ala. 486. The
doctrine of estoppel does not apply.   59 Ark. 344, 351; 58 Ark.
270, 275; 54 Ark. 252; 42 Ark. 118; Mech. Pub. Off. § 837.

*Rose, Hemingway & Rose,* for appellee.

If the contract be, as agreed by appellants, one made by the
state, she is bound thereby, upon the same principles as a private
person would be.   16 Wall. 232; 15 How. 308. As no power of
revocation was reserved, it could not be exercised.   15 Fed. Cas.
214; 65 Ia. 719; S. C. 23 N. W. 139; 15 Cal. 429; 7 Minn. 286.
It must be presumed that, in making the contracts, the board did
its best for the state.   60 Ark. 96.   The action of the board cannot
be attacked unless bad faith be shown.   The statutes of 1869
(p. 170), of March 28, 1871, and April 15, 1873, are all *in pari
materia,* and must be construed with the present statute governing
the lease and management of convicts.   End. Stat. Int. §§ 43,
368; 11 Ark. 596; 3 How. 565; 137 U. S. 686; 18 Wall. 301; 47
Fed. 136.   The discretion of the board, if honestly exercised, is
not subject to control.   13 How. 52; 7 Wall. 347; 3 Ark. 427; 9
Ark. 242; 26 Ark. 13; 2 Ark. 230; 2 La. Ann. 542.   When the
contract was once made, its validity became a question for the
courts alone.   23 La. Ann. 225.   The mention of one ground of
forfeiture in the contract itself excludes all others.   Wood, Land.
& Ten. 521; 1 Ark. 203; id. 540; End. Stat. Int. § 398; 59 Ark.
409.   The term of the contract was not limited to the official life
of the officers who entered into it.   18 How. 596; 12 Ore. 459,
S. C. 544; 67 N. Y. 36; 29 N. E. 385, 387; 37 Pac. 282; 40
Pac. 175; 11 Paige, 93; 23 N. E. 752; S. C. 7 L. R. A. 160;
44 Mich. 500; 16 Wis. 336; 24 Minn. 273; 112 Cal. 159; S. C.
44 Pac. 358, 361; 76 Fed. 271, 281; 49 N. W. 21; 7 So. 559,
560; 88 Fed. 720, 737; 39 Atl. 335; 48 Pac. 824, 831; 49 Pac.
15, 21; 19 So. 771; 15 Atl. 67, 78; 98 Ill. 415; 6 Atl. 424. S. C.
48 N. J. L. 378; 65 Conn. 334; 36 Ia. 396.   The question of

expediency of the contract was for the authorized agent, and not the courts, and is material only as bearing on the charge of fraud. 50 Ark. 447, 451; 53 Ark. 486; 55 Ark. 153; 67 N. Y. 36; 29 N. E. 385; 7 So. 11, 12; 39 Atl. 336; 34 Ark. 608; 43 Ga. 67, 78; 49 Pa. 21; 7 So. 560; 15 Atl. 325. If subject to attack on the ground of unreasonableness, that fact must be made to appear plainly and unmistakably, and if the contrary is alleged by the complaint it must be accepted as true on demurrer. 76 Fed. 282; 16 Wis. 336; 52 Ark. 302; 56 Ark. 374. A state is bound by its contracts as an individual. 34 Ark. 608; 7 So. Rep. 12; 50 Ark. 447, 481; 45 Ark. 88; 71 N. Y. 527, 549; 89 N. Y. 44; 1 Dill. Mun. Corp. § 66; 4 Am. & Eng. Corp. Cas. 566; 31 N. E. (Ind.), 573; 44 Pac. 358; 39 Atl. 335; 172 U. S. 15. The authority to contract implies the power to make an agreement binding on both parties. 4 Am. & Eng. Corp. Cas. 566; 39 Atl. 336; 70 Ala. 136, 143. And to make a contract that interferes with or prevents, to some extent, making other contracts. 31 N. E. 577; 13 Pac. 491; 39 Atl. 336. Even admitting that the time is too long, the contract would be good to the limit of the legal period, and void only as to the excess. Webb, Usury, §§ 287, 519; 39 Ark. 335; 133 U. S. 488; 45 S. W. 708; 1 Russ. & M. 501; 55 Ark. 159; 34 Ark. 603; 9 So. (Ala.), 815; 28 Pac. (Kan.), 1103; 19 Am. & Eng. Enc. Law, 513; 96 U. S. 341; 76 Fed. 271, 280; 4 Am. & Eng. Corp. Cas. 554, 563; Taylor, Land. & Ten. § 138; 24 Minn. 273; 70 Ala. 144; 2 Ves. Sr. 644; Nelson's Rep. 87; Ambler's Rep. 740. Certiorari would not lie. 62 Ark. 96; 54 Ark. 659; 2 Ark. 257; 26 Ark. 9; 46 Ark. 386; Cooley, Const. Lim. 104. If certiorari was proper, it was not the exclusive remedy, and did not displace the rights to injunction. 14 Ark. 257; 6 Ark. 358. Objection on this ground should have been by motion to transfer from chancery, and not by demurrer. Sand. & H. Dig., § 1105; 51 Ark. 235; 52 Ark. 126; id. 415. This is not a suit against the state. Since the action of the board in rescinding the contract was beyond its authority, it was not the agent of the state in so doing, and the state is not a proper party to this proceeding. The board was not the judge of the extent of its authority. 2 Ark. 282; 10 Ark. 145; 16 Ark. 390; 11 Ark. 598; 66 Ark. 36; 41 W. Va. 471; S. C. 23 S. E. 804; 9 Minn. 258; 79 Ind. 373; 7 Fed. Cas. 854; 3 McLean, 539; 28 Fed. Cas. 24; 11 Ark. 598; 9 Ad. & E. 1. All judicial

powers are vested in the courts. 21 N. E. 244; 9 Bush, 247; 103
U. S. 191. When public agents exceed their authority, their acts
are void, and do not bind their principals. 96 U. S. 692; 93 id.
257; 4 Ark. 284; 44 Ark. 456; 27 Ark. 242; 37 Ark. 142; 24 Ark.
402; 58 Ark. 381; 32 Ark. 269; 54 Ark. 165; 33 Ark. 276; Mech.
Pub. Off. § 663. If their action in endeavoring to cancel the con-
tract was illegal, the state has no interest in justifying it.   11
Wheat. 585; 2 Pet. 323; 109 U. S. 452; 154 U. S. 391; 16 Wall.
203; 92 U. S. 541; 114 id. 315; 107 id. 695; 114 id. 317; 140
U. S. 1; 167 id. 221; 40 Ark. 256; 42 Ark. 244. This is a
proper case for an injunction. Sand. & H. Dig., § 3777; 2 Bl.
551; 72 Ala. 277; S. C. 47 Am. Rep. 412; 3 Pom. Eq. Jur.
§ 1344; 32 Ark. 343; 55 N. Y. 393; 90 N. Y. 409; 147 U. S. 401;
92 U. S. 531, 541; 114 U. S. 315; id. 295; 4 Ark. 303; 30 Ark.
609; 39 Ark. 412; 42 Ark. 66; 53 Ark. 205; Mech. Pub. Off.
§ 995; 24 How. 268; 1 Black, 342; 13 Wall. 84, 86, 87; 84 Ia.
649; S. C. 51 N. W. 179; 148 Mass. 1; S. C. 18 N. E. 595;
3 Sumn. 189; S. C. 29 Fed. Cas. 506; 138 U. S. 46. Appellants
had no power to annul their contract. 9 Ad. & E. 1; 103 U. S.
168. There being no adequate remedy at law, equity had jurisdic-
tion. 5 Wall. 74; 7 Wall. 430; 134 U. S. 349; 144 N. Y. 174;
S. C. 38 N. E. 997; 156 U. S. 688; 158 U. S. 406; 160 U. S.
51; 9 Cranch, 494; 106 Mass. 253; 129 Mass. 405. Injunction
is grantable where a multiplicity of suits would be required to
redress the threatened wrong. 145 U. S. 473-4; 138 U. S. 46;
144 U. S. 566; 163 U. S. 600; 24 Pa. St. 159; S. C. 62 Am. Dec.
372; 19 Eng. L. & Eq. 287; 1 High, Inj. §§ 63, 65; 2 id. § 1142.
Appellee, under its contract, has a franchise. 13 Bush, 189; Bouv.
L. Dict.; 15 Johns. 386; 17 Conn. 40; S. C. 42 Am. Dec. 717.
Injunction would lie to protect this franchise. 4 Edw. Ch. 258;
12 Barb. 553; 3 Ired. Eq. 613; S. C. 44 Am. Dec. 83; 24 Pa. St.
159; S. C. 62 Am. Dec. 372; 16 Pick. 525; 5 Johns. Ch. 112;
9 Wheat. 841; 20 Ark. 566; 25 Ark. 28; 53 Fed. 499; 56 Fed.
771; 19 Fed. 327.

*Morris M. Cohn, T. H. Humphrey* and *Kirby & Carter,* for
appellant, in reply; *George W. Murphy, Attorney General,* of coun-
sel.

The contract was invalid. An agent of the state cannot in-
crease his power by usage. 115 Mo. 524; id. 534; 105 Mo. 182;
End. Stat. Int. §§ 361, 362; 18 Ark. 456, 462. The contract

not being susceptible of specific enforcement, no injunction was grantable. 2 Ch. Cont. 1467; Pom. Spec. Perf. § 24; 3 Pom. Eq. Jur. § 1405; 63 Fed. 310; 58 Conn. 356; S. C. 20 Atl. 467; L. R. 11 Eq. Cas. 18, 23.

Bunn, C. J.    This is a bill in equity filed in the Pulaski chancery court by the appellee, the Arkansas Brick & Manufacturing Company, against E. T. McConnell, as superintendent, and M. D. L. Cook, as financial agent, and Jefferson Davis, J. W. Crockett, George W. Murphy, T. C. Monroe and Frank Hill, members of the board of penitentiary commissioners, with prayer as follows, to-wit:

"The premises considered, the plaintiff prays that a temporary restraining order be issued, restraining the defendants, and each of them, from taking any action to prevent the due performance of said contracts, or towards a restriction thereof, and particularly from taking from the plaintiff's works any of the men now engaged in labor therein; and requiring defendant McConnell, as superintendent of the penitentiary, to proceed with the execution of said contracts and the furnishing of labor as therein agreed upon. And plaintiff prays that, upon a final hearing, a decree be entered as above prayed, and that the said order of the board canceling the contract be declared null and void."

The contracts were made by E. T. McConnell, as superintendent at the time, and J. C. Massey, as financial agent, and approved by the board of penitentiary commissioners, consisting at the time of D. W. Jones, governor; Jefferson Davis, attorney general; Clay Sloan, auditor; A. C. Hull, secretary of state, and Frank Hill, commissioner of mines, etc., all of whom made and approved the contracts and assignments thereof; and the rescinding resolution was passed by the board of commissioners, composed at the time of Jefferson Davis, governor; G. W. Murphy, attorney general; T. C. Monroe, auditor; J. W. Crockett, secretary of state, and Frank Hill, commissioner of mines, etc.

The complaint sets forth *in extenso* a contract made by and between the said superintendent and financial agent, on the one part, and the Arkansas Chair Factory, on the other, and the approval of the same by the board of penitentiary commissioners, signed in writing by each and every one of them, and the subsequent assignment of the same by the chair factory company to the Arkansas Brick & Manufacturing Company, the appellee, with the

approval of said penitentiary ·board. It ·further sets forth that, by reason of the passage of the act to erect a new state house on the penitentiary grounds and the putting of said grounds in control of the state house commissioners, and the consequent necessity of removal of the penitentiary walls and buildings to another locality and erecting others there, it became necessary to make an amendment to the original contract, or a substituted contract, and that the same was made and approved by the said board of commissioners as in the first instance; and that under these contracts both parties proceeded to and did perform their respective obligations for and during the period of eighteen months, and that the plaintiff, by reason of said contracts, expended large sums of money in perfecting its plant, so as to be able to perform its part of the same, and entered into engagements by reason thereof involving many thousands of dollars, impossible to be complied with unless the laborers are furnished·it in accordance with the contract aforesaid. That, up to the time of the adoption of the resolution, plaintiff has continued promptly to report as required, and to pay into the treasury the monthly sums stated according to said reports for the hire of the convicts permitted to labor for it, and for the last month, extending up to the date of the canceling resolution, it has paid in the sum of $4,000 or more for the hire of about 200 convicts for the month. That on the 13th day of August, 1901, the said board of penitentiary commissioners at one of its meetings passed a resolution in the following language, to-wit: "Believing that said contract is unjust to the state and made without legal authority, because the same was made for a term of years beyond the life of the board making it and amounts to a lease of the state convicts which is prohibited by law, and believing that it is to the best interest of the state and the management of the penitentiary that the same be annulled and set aside, therefore, be it resolved by the penitentiary board that said contract, so entered into between the state of Arkansas and the said Arkansas Brick & Manufacturing Company be, and the same is hereby, annulled, canceled and held for naught, the cancellation of said contract to take effect October 15, 1901, and on and after said October 15, 1901, the state refuses to further comply with the terms of said contract, and the superintendent of the penitentiary is hereby ordered on and after said date to withdraw from said Brick & Manufacturing Company all convicts in their employ

and turn them back into the walls of the penitentiary, subject to the further orders of this board." Plaintiff states that, by reason of this resolution, the contracts were in effect annulled and set at naught, and, by reason of said breach of the same, it has lost, and will lose, as a natural consequence, a sum of money largely in excess of $100,000, and that its consequential damages will be a very large sum, detailing each item of damage; that the contracts were fair and lawful, and that said resolution was without authority of law, while in fact having the force and effect of law, in that it put a stop to the performance of said contracts, since the said superintendent and financial agent will obey the same, unless restrained. The contracts are exhibited with the complaint, and said resolution is set out in full therein.

The defendants filed their demurrer to the complaint, containing seven several grounds. Nos. 3, 4 and 5 were subsequently withdrawn, and the court overruled the same as to grounds 1, 2, 3, 6, 7 and 8, which are as follows, to-wit:

"1. For that the said parties are not and could not be charged to have done anything in their individual capacity, nor have they, nor is it shown that they have any individual capacity to carry any pretended contract with the complainant into effect, as set forth in its complaint and amendments, and in their official capacity are acting solely in behalf of the state.

"2. And because said complaint and amendment thereto seek only for relief respecting convicts belonging to the said state, and, if the matters recited therein have any validity, which they deny, complainant's cause of action is against the state of Arkansas, and cannot be maintained.

"6. Because the said complaint and amendment thereto do not state a cause of action.

"7. Because the facts set forth in the said pleadings do not entitle complainant to any relief herein.

"8. Because this court has no jurisdiction to grant the relief prayed for herein."

The chancellor overruled the demurrer upon each and every one of said grounds set forth above, and the defendants declined and refused to answer or plead over, but rested on their said demurrer, and thereupon the following decree was rendered, to-wit:

"Thereupon, being well and sufficiently advised as to all matters of fact and law arising herein, as shown by the complaint and confessed by the demurrer, this court doth order, adjudge and decree that the resolution passed by the board of commissioners for the management of the state penitentiary of the state of Arkansas, on the 13th day of August, 1901, attempting to cancel and annul the contract purporting to have been made by and between the parties to this litigation and filed as an exhibit to the complaint, be, and the same is hereby, canceled and held for naught. . That the defendants, Jefferson Davis, J. W. Crockett, T. C. Monroe, George W. Murphy and Frank Hill, as members of said board of commissioners, be, and they are hereby, enjoined and restrained from in any manner canceling or annulling said purported contract, without sufficient cause being shown therefor. That the defendant, E. T. McConnell, as superintendent and keeper of the Arkansas penitentiary, and M. D. L. Cook, as financial agent of said penitentiary, be, and they are hereby, enjoined and restrained from executing and carrying into effect the said resolution of the said board of commissioners, passed as aforesaid; and that they, together with the said members of the board of commissioners, be, and they are hereby, enjoined and restrained from refusing and failing to execute and carry out the terms of said purported contract until its illegality or invalidity as a contract shall be adjudged and declared, by some tribunal vested by law with jurisdiction and authority, to be illegal or invalid. That the costs of this action be paid by the defendants, for which execution may issue. From this decree the defendants pray an appeal to the supreme court of Arkansas, which is granted."

Every allegation of the complaint is admitted to be true by the demurrer, and it is unnecessary to set forth the complaint at length, or to incorporate herein the contracts involved, as those parts of the same within the scope of the demurrer will be referred to as occasion may demand. The issues of law (for there are no issues of fact) will be discussed in their logical order, and not in the order presented in the demurrer.

Treating the sixth ground of demurrer as a general demurrer within itself, the question is whether or not the penitentiary officials acted within the provisions of the statute made and provided for such cases in making the contract involved and the amendment thereto. If they did so, the other questions are more or less

37

secondary. If, however, they went beyond this statutory authority in doing so, there is no need to go further with this discussion, for, as was said by this court in *Woodward* v. *Campbell*, 39 Ark. 580, "the state is liable only to the extent of the powers actually given to its officers, and not to the extent of their apparent authority; and all who deal with a public agent must, at their peril, inquire into his real power to bind his principal." And also in *Parsel* v. *Barnes*, 25 Ark. 261, this court said: It is "well settled that public officers and agents are held more strictly within the limits of their prescribed powers than private general agents." And "that the fact that a contract made by a public agent related to a subject within the general scope of his powers does not bind his principal, if there was a want of specific power to make it." In other words, the state, as principal, cannot be bound by the contracts of one acting for her and in her name, unless it can be fairly gathered, from the law under which he acts, that he is not only the appointed agent of the state for that purpose, but has kept himself within the purview of the law on the subject. Nor can the state be bound by statute, under the general rule, unless expressly named.

In argument, it is contended by the defendants that the clause of the contract which attempts to obligate the state to furnish the labor of as many as 300 able-bodied convicts on demand is too indefinite and uncertain to be enforced, and that this uncertainty vitiates the contract. The stipulation on the subject in the contract is: "The first parties (defendants) agree to furnish 300 able-bodied men on demand of plaintiff after January 1, 1900, and plaintiff agrees to work never less than 100."

The defendants cite one case, *People* v. *Dulaney*, 96 Ill. 503, which at first blush would seem to be an authority in favor of their proposition, in which case the supreme court of Illinois says: "A prayer, in a petition for a mandamus against the penitentiary commissioners to compel the performance of a contract with them for convict labor, that they be compelled to assign to the relator 200 convicts of the 'kind and quality' called for and specified in the agreement, renders the petition uncertain and indefinite, as it cannot be told what specific act is sought to be coerced." That was a proceeding by mandamus to compel the specific performance of a contract, and the argument of the court was that the duty sought to be made the subject of the compulsory order was not

sufficiently defined in the contract to warrant the issuance of the order. On close inspection of that case, it is found that the diffi· culty was not so much in the indefiniteness of the contract as to the labor of 200 convicts, but the difficulty existed in the incon sistent statements of the contract in that regard, occasioned by the inadvertent use of a blank printed form which was incon sistent with the part of the contract written and really made. Besides, the case went off on several other points, so that it is not clear what emphasis was given to the question of indefiniteness, which, of course, is an important question in mandamus proceed ings. There is nothing of vagueness and indefiniteness in the stipulation as to the number of the convicts mentioned in the con tract between the parties to this action.

The other reason assigned why the contract should be held invalid and *ultra vires* is that it runs ten years, a period longer than the official life of any of the parties of the first part, the defendants herein, and their predecessors, who joined in making the contract on the part of the state. The question whether it were better for such a contract to run a long or a short time is one for the exercise of the sound discretion of the superintendent and financial agent in making the contract, in the first instance, and the approval or disapproval of the board of penitentiary commis sioners, in the second place, and, they having exercised that dis cretion with fairness, so far as appears upon the face of the con tract, the courts cannot seek to control it, without allegation and extraneous proof to the contrary.

The personnel of the superintendent and financial agent and the membership of the board may undergo a change, the official term of each may expire, or each may die or resign, before the expiration of the contracts they have all made, be that term long or short, and yet no one would say that that circumstance could affect such contracts in any way whatever, for the contracts which they have lawfully made are supposed to continue indefinitely, until all obligations assumed by them for the state have been met and fully discharged. Besides, the official life of a mere agent has never been before, to our knowledge, set up as a limitation upon the performance of contracts continuous in their nature or other wise. The state is the principal, and never dies, and the state could have discharged every one of these agents at any session of

our legislature after the contract was made, and that would have had no effect whatever upon the integrity of the contracts.

A number of authorities are cited in support of defendant's contention in this regard. It is only necessary to gain a correct understanding of the peculiar facts in each case to see that none of them are applicable to the facts of the case at bar. ` Thus in *St. Louis, I. M. & S. Ry. Co.* v. *Loftin,* 30 Ark. 693, it was held that "the right of taxation cannot be parted with by one legislature so as to bind future legislatures, unless under peculiar and exceptional circumstances, and upon an adequate consideration, and no presumption in favor of exemption from taxation can be indulged." And in the next syllabus in the same case the court said: "An exemption from taxation contained in the charter of a corporation cannot be repealed without the consent of the corporation." In *Files* v. *Fuller,* 44 Ark. 273, the ruling was this: "No legislature has power to prescribe to the courts rules for interpretation, or to fix for future legislatures any limits of power as to the effect of their action." In *Crenshaw* v. *United States,* 134 U. S. 99, the supreme court said: "An officer in the army or navy of the United States does not hold his office by contract, but at the will of the sovereign power." "It is not within the power of a legislature to deprive its successor of the power of repealing an act creating a public office."

In *Illinois Central Railroad* v. *Illinois,* 146 U. S. 387, and other cases, it is held by the supreme court that "there can be no unrepealable contract in a conveyance of property by a grantor in disregard of a public trust under which he was bound to hold and manage it." The case of *New Orleans Gas Company* v. *Louisiana Light Company,* 115 U. S. 650, is evidently an authority for the opposite of that intended. The same may be said in reference to *Porter* v. *Haight,* 45 Cal. 631. So it is, all the citations fall short of the mark, as we read them. A pure and simple contract by the state with a private individual or corporation, under statutes of the state, is not to be called in question from the mere circumstance of the time which it is made to run, unless, perhaps, as a question of fact it is shown to be unreasonable on that account.

Finally, as to the authority of these penitentiary officials to hire out the labor of the convicts, we think, there can be little controversy. Formerly, the penitentiary grounds and buildings, with the convicts, were leased out under contract with a lessee.

Now, however, the grounds and buildings are not leased; neither are the convicts, for they must remain under the control of the state, and only their labor can be engaged by contract with corporations or individuals. The statute on the subject is now as follows, viz:

"Sec. 4. The said board shall have the general management and control of the state penitentiary and all convicts sentenced to said penitentiary, whether within or without the walls thereof. It shall make or approve all contracts for the building of any additions, repairs, barracks, stockades and improvements necessary to be made in connection with the penitentiary or convict system of this state, on the terms prescribed by law, or, in the absence thereof, on such terms as it may consider for the best interest of the state. It shall have power to purchase, or cause to be purchased, with such funds as may be at its disposal not otherwise appropriated, any lands, buildings, machinery, live stock and tools necessary for the use, preservation and operation of the penitentiary, to the end that the largest number of convicts that can be comfortably accommodated and be made self-supporting may be confined therein; and, until adequate provision be made by the general assembly for the confinement and employment of convicts within the walls, said board shall cause to be employed the excess of convicts at labor outside the walls, either under the contract or state account system, under such regulations, conditions and restrictions as it may deem best for the welfare of the state and the convicts, and said board shall, when it has means at its disposal which can be so used from time to time, purchase or lease and equip a farm or farms, upon which convicts who are not suitable for contract labor, and who cannot be made self-supporting within the walls, shall be worked on state account; *Provided,* said board shall not have the power to remove or sell the present penitentiary under this act.

"Sec. 5. The system of labor for convicts shall be the state account system, or contract system, or partly one and partly the other, as shall, in the discretion of the board of commissioners, be deemed for the best interest of the state; but no contract shall be let for any of such convict labor, if equally remunerative employment can be furnished by the state and worked on state account." (Acts 1893, p. 123; Sand. & H. Dig., §§ 5499, 5500.)

Then follow restrictions as to the control and management of the convicts and provisions against the further practice of the

lease system formerly practiced in this state, all of which appear to have been strictly observed in the contract involved in this case. With these named qualifications and restrictions, nothing could be more plenary than the power given to make contracts concerning the labor of the convicts, and to say that the contract is *ultra vires* is going beyond all rules of fair interpretation, for it is impossible to discover anything in the contract which contravenes or transcends the very full power conferred upon the board of penitentiary commissioners, as will readily appear from the particular objections raised by the demurrer and the argument thereon and the absence of others.

But, while we all think that this was a valid contract, yet, as the statute seems only to authorize such contracts, to quote its language, "until adequate provisions be made by the general assembly for the confinement and employment of all convicts within the walls," and as the statute further declares that "the state shall never be deprived of the right to direct how, at any and all times and under all circumstances, its convicts shall be lodged, fed, clothed, guarded, worked and treated (Sand. & H. Dig., §§ 5499, 5500), it may follow that the legislature has, under this provision, the right to abrogate this contract at any time, and to direct that these convicts be placed on a farm or worked in some other way different from that named in the contract. But, that question not being directly involved in this proceeding, it is unnecessary and probably unwise to decide it at this time, and we mention it, not to express an opinion upon it, but merely to show that, while holding that the board cannot, without legislative permission, refuse to carry out the contract, yet we do not say that the legislature cannot do so, under the provisions of the statute above quoted.

The next question in order is raised by the statement of the first and second grounds of the demurrer, which may be considered together, as the gravamen of each is practically the same.

The defendants assume that, as the contract is a state matter, it follows that their rescission of it, after it was made and entered into, and after the plaintiff had gone to heavy expense in preparation to perform its part (which is all confessed to be true), was also a state matter, as they were in this rescission of the contract acting for and in behalf of the state, as they had acted in the making of it.

This argument overreaches itself in more than one particular. In one part of the demurrer it is contended, as we have just seen, that the defendants acted without the authority of law in making the contract, and that for that reason the same was null and void. But in the first and second grounds of the demurrer now under consideration the contention seems to be that in making the contract they were acting within the purview of the law, for they say that they were acting as the agents of the state, which cannot be, unless they were acting within the purview of the law on the subject, for the state will not stand sponsor for the acts of her agents except such as are done strictly within the law.

But really there is no contention on the part of the plaintiff that the board of commissioners was not observing the law in making the contract, but, on the contrary, it insists that the contract was one lawfully made and fair in its stipulations, and it is only complaining that defendants have not only refused to perform it as a state contract, which it is their duty to do, but by their affirmative acts have prevented their subordinates, the superintendent and financial agent of the penitentiary, from doing anything towards the fulfillment of the obligations of the state. So that the complaint of the plaintiff is, not that the contract is not a state contract and a state affair, but that its attempted rescission and annulment by the board of commissioners is without authority of law, and therefore no state affair whatever.

The power and authority to make a contract is one thing, but the power to abrogate it is quite another thing, and the latter power is in this government possessed by neither the state nor any of her citizens. The state can only speak through the legislative department, which is the mouthpiece of the sovereign, and the legislature can lawfully pass no law impairing the obligation of contracts. Section 10, article 1, of the Constitution of the United States.

Hence it was said by this court that "the legislature itself has no power to deprive one of the benefits of a contract lawfully made by the commissioners for letting public contracts." *Berry v. Mitchell,* 42 Ark. 243. But this principle of constitutional law is too plain to require discussion.

It is and has been the law from time immemorial that a public officer or public agent acting without the scope of his authority— without the authority of law—cannot shield himself behind the

sovereign, the state; but where injury is thereby done to private citizens, the officer or agent is a trespasser and personally liable in damages. *Six Carpenters' Case,* 8 Coke, 147, 1 Smith's Leading Cases, part 1, page [62].

This principle is exemplified in almost daily practice at this time. In *Poindexter* v. *Greenhow,* 114 U. S. 270, the supreme court said: "An action or suit brought by a taxpayer, who has duly tendered such coupons (coupons made receivable for taxes) in payment of taxes, against the person who, under color of office, as tax collector, and acting in the enforcement of a void law passed by the legislature of this state, having refused such tender of coupons, proceeds, by seizure and sale of the property of the plaintiff, to enforce the collection of such taxes, is an action or suit against him personally as a wrongdoer, and not against the state, within the meaning of the Eleventh Amendment to the Constitution.

"Such a defendant, sued as a wrongdoer, who seeks to substitute the state in his place, or justify by authority of the state, or to defend on the ground that the state has adopted his act and exonerated him, cannot rest on the bare assertion of his defense, but is bound to establish it; and as the state is a political corporate body, which can act only through agents, and command only by laws, in order to complete his defense, he must produce a valid law of the state, which constitutes his commission as its agent, and a warrant for his act."

In this case there is no law of the state repudiating or authorizing the repudiation or cancellation of the contract, but the defendant commissioners, possessing no judicial powers and no authority from the legislature, attempt to avoid their own valid contract by a mere resolution of their own. Of course, that could not be pleaded in any court of justice as a protection against personal liability, nor can the state be drawn into such a controversy.

Our attention is called by the able counsel of defendant to several cases which, it is thought by them, announce a different doctrine. Thus, in the case of *In re Ayers,* 123 U. S. 443, which was a suit by aliens, the object of which was to enjoin the attorney general and commonwealth's attorneys of the several counties, cities and towns from bringing any suit in the name of the commonwealth to enforce the collection of taxes for the payment of which coupons originally attached to the bonds had been tendered,

the supreme court of the United States held that it was a suit, in effect, against the state of Virginia, and within the prohibition of the Eleventh Amendment to the Constitution, which denies jurisdiction of the federal courts to entertain a suit against a state. It is said by the supreme court in that case that "for a breach of its contract by the state it is conceded there is no remedy by suit against the state," and "a bill, the object of which is by injunction, indirectly, to compel the specific performance of the contract, by forbidding all these acts and doings which constitute breaches of the contract, must also, necessarily, be a suit against the state."

The acts and doings which constituted breaches of the contract in this case were acts and doings of the state herself, by which she forbade her officers and agents to carry out the contract, and not the acts and doings of the officers and agents themselves. The decision in that case, it appeares to us, however, was at least an apparent modification in some sense of the opinion in *Poindexter* v. *Greenhow*, referred to above, only in this particular, however, that when the state herself has acted through her lawmaking department, and has made and declared the breach of her contract, although this be invalid as in contravention of the constitutional inhibition of acts impairing the obligation of contracts, yet, so far as her agents and officers are concerned, the law, however invalid, is a law unto them, because the state is the real author of the breach, but she cannot be sued. In the former case, the court held that the officer or agent, in resisting the enforcement of the contract as originally made, must run the risk of the later law, under which he now acts, being declared invalid in the courts. But the courts cannot make such declaration against a law of the state, for the state is not amenable to their jurisdiction. The rule in *In re Ayers* is manifestly the sound one. But the difference does not affect the case at bar, for, while an act of the legislature may and does constitute the rescinding act, however unlawful, a state matter, for which the state is responsible, and not her agents, nevertheless an unauthorized resolution of her agents, having for its object the rescission of a valid contract, and tending to accomplish that object, is by no means the act of the state, and cannot bind the state in any sense. No one can assume that the state will do an unlawful act by ratifying the acts of her agents which amount to a direct violation of the laws of the land. It must always be assumed that the sovereign will do right and justice, and hence

throughout the ages he has been subject to no compulsory process; for, when once it is admitted that the sovereign will not do right except by compulsion, we reflect upon his dignity, and it is for the very reason that he possesses this nice sense of honor and justice that the law frees him from judicial inquiry and process, and there is no other reason therefor in constitutional government.

Going back to the case of *In re Ayers*: Notwithstanding what was said therein, as cited above, the court further said: "Suits are justifiable against individual defendants who, under color of authority of unconstitutional legislation by the state, are guilty of personal trespass and wrongs; and against officers in their official capacity, either to arrest or direct their official action by injunction or mandamus, when such suits are authorized by law, and the act to be done or omitted is purely ministerial." In the case at bar, the state has not given any authority to the board of penitentiary commissioners to pass the resolution by which it undertook to annul the contract. It was the board's unauthorized act. And, notwithstanding the contract, from the date of its making for a period of eighteen months, had been faithfully and without complaint carried out by both parties, the state has ever been silent on the subject of the rescission, and has taken no steps to accomplish the same, or to show her desire to become *particeps* in that effort, although one session of the legislature has been held and passed while the contract was being performed, and the subject was necessarily before it; and also while the attorney general has been always at hand to do the bidding of the state in respect to that or any other proper matter.

The contention of the defendants under this head really would have us to presume that the state is involved in their refusal to execute the contract, because the state is bound by the contract made by them for her, and that for that reason, also, the suit should be dismissed because she is the real party in interest and cannot be sued. The authorities do not sustain such a contention. No one can or must be allowed to presume that the state unites in a palpable violation of the fundamental or other laws of the land, which a repudiation of her valid contracts undoubtedly would be, and therefore no one, neither courts nor individuals, can predicate their actions upon any such presumption or assumption of what the state may do. If the state should, through her legislature, annul her contract, merely because she has the power to do so,

that would, of course, put an end to the contract, until restored at
the instance of the state by some proper method, for such an act
of the legislature would make the state a real party to the con-
troversy, and thereafter no tribunal, except at the instance of the
state herself, is authorized to make inquiry into or gainsay such a
governmental act. But the case is different where the refusal is a
mere resolution or other unauthorized act of the agent.

In the case of *Osborn* v. *U. S. Bank,* 9 Wheat. 738, the con-
tention of the appellant was substantially the same as in this case.
In that case the counsel for appellant contended thus in argument:
"If, then, the state be the only party interested, and if the bill,
in its terms, and in its effect, operates solely upon the state, the
state ought to be made a party. If the circuit court cannot
exercise jurisdiction when the state is a party direct, it cannot be
permitted to obtain that jurisdiction by an indirect mode of pro-
ceeding. We maintain [says the counsel in that case, continu-
ing] that the state of Ohio is, in fact, the sole defendant in this
cause, and that the jurisdiction of the circuit court is excluded,
(1) By the constitution of the United States; (2) by the judiciary
act." In the case at bar, the contention is identically the same,
except that it is contended that the jurisdiction is excluded by the
state constitution, which declares that the state shall never be made
a defendant in any of her courts. The difference, if a difference
at all, is immaterial. In that case Chief Justice Marshall, speak-
ing for the court, said, quoting from the syllabus (for the opinion
is too lengthy to extract from even) : " In general, an injunction
will not be allowed, nor a decree rendered, against an agent, where
the principal is not made a party to the suit. But, if the principal
be not himself subject to the jurisdiction of the court (as in the
case of a sovereign state), the rule may be dispensed with."

In *United States* v. *Lee,* 106 U. S. 196, where the real ques-
tion was, whether or not the suit was maintainable because con-
gress had given no permission by act to sue the United States, as
was generally the requirement in order to maintain a suit against
the United States, the supreme court of the United States said:
"That doctrine has no application to officers and agents of the
United States who, when as such holding for public uses posses-
sion of property, are sued therefor by a person claiming to be the
owner thereof or entitled thereto; but the lawfulness of that pos-
session and the right or title of the United States to the property

may, by a court of competent jurisdiction, be the subject-matter of inquiry, and adjudged accordingly." In other words, the agent cannot object in such case to a judicial inquiry into the lawfulness of his acts by pleading the immunity of his principal from suit. So it is, so far as we can ascertain by inquiry, everywhere and in all cases.

The conclusion upon the question raised by the demurrer in these two grounds assigned is that a state cannot be presumed to be interested with the defendants or the real party at interest to sustain their actions in a case where her agents have gone beyond the scope of their authority and sought to violate a plain provision of the law, as in this case where they seek to annul a valid contract, which the state herself cannot lawfully do; and that the agents in this make themselves wrongdoers, and are personally liable; that the state will be a proper party in such case only when she has made herself by act of her legislature a party to the refusal to perform her act, in which last case the agent will be exonerated, and, as the state cannot be made a party defendant, the suit cannot be maintained except at her instance in cases where, through her duly authorized officer, she has consented to become a party thereto. The books are crowded with decisions bearing more or less upon this point, but it would serve no useful purpose for us to go further into the inquiry.

The next question is, whether or not the plaintiff has resorted to the proper forum for relief in this case, and it is raised by the eighth ground of the demurrer.

It was once held that where one would object to the jurisdiction of a particular tribunal, it was his duty to designate the proper forum in his pleadings, under the general rule which has by us been formulated into a constitutional provision, to-wit: "Every person is entitled to a certain remedy in the laws for all injuries or wrongs he may receive in his person, property or character; he ·ought to obtain justice freely and without purchase, completely, and without denial, promptly and without delay, conformably to the laws." See section 13, article 2, Constitution of 1874.

But the defendants put these objections in this way: "This is not the remedy, if there be any," which, we take it, is tantamount to saying that there is no remedy, since they contend, also, that the only other remedy would not itself be available to plaintiff, and that remedy is by certiorari. But the argument is such that,

if certiorari is not the proper remedy, then the remedy resorted to in this case is the proper remedy, for we must not say, in the teeth of the constitution, that one has no remedy for the redress of his wrongs.

The statute on the subject of the use of the writ of certiorari is as follows, to-wit: "They [the circuit courts] shall have power to issue writs of certiorari to any officer or board of officers, or to any inferior tribunal of their respective counties, to correct any erroneous or void proceedings, and to hear and determine the same." Sand. & H. Dig., § 1125. It is contended, in effect, that the board of commissioners of the penitentiary is such a board of officers as is named and contemplated in the act above quoted, which is a part of the civil code, as amended in 1873. We cannot take the time to go into a legal construction of this act, for that has already been done by this court in the case of *Pine Bluff Water & Light Company* v. *City of Pine Bluff*, 62 Ark. 196, which is but a reaffirmance of the common-law rule, in which it is said by this court (quoting from the syllabus): "The action of officers or public bodies, of a purely legislative, executive or administrative nature, is not reviewable on certiorari at common law, although it involves the exercise of discretion; but it is not essential that the officers or bodies to whom it lies shall constitute a court, or that their proceedings should be strictly and technically 'judicial;' it being sufficient if they are *quasi* judicial.

"The scope of the writ of certiorari at common law, which is limited to the review of judicial or *quasi* judicial proceedings, is not enlarged by Sand. & H. Dig., § 1125, authorizing circuit courts to issue writs of certiorari to any officer or board of officers, or any inferior tribunal in their respective counties, to correct any erroneous or void proceeding, and to hear and determine the same."

It is plain that the defendants, as penitentiary commissioners, are clothed with nothing more than executive or ministerial powers, and with neither judicial nor *quasi* judicial powers. The writ of certiorari would not lie against them to correct their errors. It follows logically that the proceeding by injunction was the proper and appropriate proceeding.

A very fair and pointed illustration of a tribunal which is not a court, which is not a part of the judicial department of the state, and yet is so far a *quasi* judicial tribunal as to be the subject of the writ of certiorari to correct its errors, will be found, in the

case of *People* v. *Hoffman,* 166 N. Y. 462, where, by the nature of the powers conferred upon it, conforming essentially to the power conferred upon a regular court, a military tribunal was held to be so far a judicial tribunal that its proceedings were reviewable upon certiorari. The distinction between the case at bar and that case is so marked, and the rule so well illustrated therein, that we think one need not err in making the proper discrimination.

The case of *Southern Mining Company* v. *Lowe,* 31 S. E. Rep. 191, cited by appellants, is not applicable to the question in this case on the point as to what is the proper forum, but is applicable for the plaintiff, however, on the question of the power of the commissioners to make the contract involved, in which the supreme court of Georgia says: "The writ of injunction does not, under any circumstances, or at the instance of any person, lie against the prison commissioners of this state to restrain them from entering into a contract for the hiring of convicts, nor against any person or persons with whom the commissioners are about to make such a contract, when the granting of the injunction would, either directly or indirectly, interfere with the performance by the commissioners of the duties devolved upon them by the act creating a prison commission for this state." Certainly not; for they were authorized to make such contracts by the law, and so are the commissioners in this state authorized to make such contracts. The courts cannot interfere with the state's agents in making contracts for the state authorized by law to be made. The question here, however, is, can the courts interfere by injunction to restrain these agents from doing acts not authorized by the law? We think they can.

The defendants contend under their demurrer that "a court of equity ought not to attempt to do by injunction anything which does not admit of enforcement." The object of the injunction in this case is to restrain the defendants from doing what they have been and are attempting to do in violation of law, and in a mistaken view of their duties under the law. That is certainly not within the category of things impossible of doing. It is, in fact, expected that, when the defendants are advised of the law under which they perform their duties, they will govern themselves accordingly. But they support this proposition by the citation of authorities. This point is most frequently illustrated by the case of a contract with an artist to paint a picture, or with an actor

to perform a part in a play. From the peculiar nature of the subject-matter of the contract, and the performance of it being so closely connected with the special qualifications of him who is engaged to perform it, and above all because it is a something that an order cannot compel to be done in the future, and, lastly, a duty the breach of which cannot be compensated in money, the courts hold that an injunction does not lie. Such cases are manifestly different from the one at bar.

The injunction is not against the state, but against the defendants, to restrain them from going beyond their powers. No order of the court can be against the state, nor against the defendants to compel them to perform these duties as officers and agents of the state. Presumably, the state, in its legislative and executive departments, will attend to that. Nor can we assume that, because the state might possibly be affected by the acts of her agents in carrying out their contract with the plaintiff, therefore she is a proper party in a proceeding to restrain them from refusing to perform their duty as the courts defined it, for, as has been said, it cannot be presumed that a state can be a party to a violation of law. The state may seek relief through the courts, on the relation of the attorney general, not only on the law, but on the facts, of the case, and the courts will readily furnish it. That plan has not been pursued in this case, for we are restricted to a determination of law questions purely.

This principle is fully covered in the decree of the chancellor, and his decree is affirmed.

### ON REHEARING.

### Opinion delivered July 12, 1902.

BUNN, C. J. This is a motion for new hearing; and is as follows, to-wit: "That the court inadvertently overlooked the fact that the cases of *St. Louis, I. M. & S. Ry. Co.* v. *Loftin,* 30 Ark. 693; *Files* v. *Fuller,* 44 Ark. 273; *Crenshaw* v. *United States,* 134 U. S. 99; *Illinois Central Ry. Co.* v. *Illinois,* 146 U. S. 387, and *New Orleans Gas Company* v. *Louisiana Light Company,* 115 U. S. 650, were not cited by them (appellants) to the point that the officer could not bind his successor in the making of a contract beyond his term, except so far as they declared a principle that no official body could tie up the hands of its successor."

We would regret very much to find that the citations of counsel were intended to be authorities for one purpose, and that we made the mistake of applying them to another. This citation is that an officer or board of officers cannot make a contract binding on his or its successors; that is to say, that a board of officers cannot make a contract valid against the state which runs, in its operation and effect, beyond their term of office. It is not easy to perceive the difference, in this connection, between a contract of an officer or board of officers which will be binding on his or their successors and a contract which will tie up the hands of the successor. They mean one and the same thing, according to our view of it.

The act of the legislature under which the contract involved purports to have been made puts no limitation upon the running of the contract, and the contention of the appellants now is to show that, as a matter of law, a question of the kind is involved where the contract shows on its face that it runs beyond the official terms of the officers of the state who made it; that is, that the contract which they themselves made, and permitted to be acted upon for eighteen months, was invalid because on its face it appears to run beyond their term of office. The contract on its face, in fact, runs ten years, but, according to the contention of appellants, it would be as valid for ten years as for three years, as a matter of law. And so it would be. But why invalid for either period of time?

The able and industrious counsel have undoubtedly made the most minute, critical and exhaustive research for authorities in support of their contention, and as a result we have about twenty-five citations made by them. Citations, however, are helpful only when applicable to the case in hand.

The case in 30 Arkansas, referred to above, was a tax exemption case, and the only principle decided was that where the legislature exempted property from taxation, when it could do so, it amounted to a contract, and is binding on all afterwards. If the exemption is granted after the charter, however, it is a matter which succeeding legislatures can abrogate. The case in 44 Arkansas simply holds that the legislature cannot assume judicial functions in the enactment of laws, nor can it prescribe rules of interpretation for the courts, nor fix for future legislatures any limits of power as to the mere effect of their action. The case in 134 U. S. is a mere reaffirmance of the well-established doctrine

that an appointment or election to a public office is not a contract, and that it is not within the power of the legislature to deprive its successors of the power of repealing an act creating an office. The case in 146 U. S. 387, lays down the rule that there can be no "irrepealable contract in a conveyance of property by a grantor in disregard of a public trust, under which he was bound to hold and manage it." The case in 115 U. S. 650 held that "in granting the exclusive privilege of supplying gas to a municipality and its inhabitants a state legislature does not part with the police power and duty of protecting the public health, the public morals and the public safety, as one or the other may be affected by the exercise of the franchise by the grantee." A surrender of the police power of the state by the legislature would be *per se* void; but, beyond this, whether or not the exercise of a franchise that could be otherwise lawfully granted involves the public health or safety is a matter of fact, and should be suggested in an answer, if true, and cannot be assumed to exist on demurrer.

Counsel say, in their motion for a new hearing, "that they cited the case of *Porter* v. *Haight,* 45 Cal. 631, to the point that under the law the power to revoke contracts was expressly reserved in the statutes on the subject of letting out convict labor, and that this could not be parted with by the superintendent of the penitentiary or the financial agent or the board of commissioners." Our attention has not been called to any clause or provision of the statute in which any or all of these officers are authorized to revoke contracts at will, which they have made in the hiring of the labor of the convicts, which is, of itself, expressly within their power to make. Judge Niles, in delivering the opinion of the court in that case, said: "We have not been referred to, nor can we find, any statute which directly authorizes the board of directors to enter into any contract for the employment of convict labor. The act of April 24, 1858, prescribing the powers and duties of the board, contains no such authorization." But, continuing, he said: "This power may be inferred from the general power, given to the board by this act, to manage and control the convicts and prison labor, and from an implied recognition" in the act of April 4, 1869, relating to the pardon of criminals; and then he proceeds to discuss the case, conceding for the sake of argument that the statutes in this way authorized the hiring of the labor of convicts. His language then in this: "Section 3 (of the act) provides that said board shall

have full and exclusive control of all the state prison grounds, buildings, prisoners, prison labor, prison property, and all other things belonging or pertaining to said state.prison. It is evident that the board would have no power to enter into any contract for the employment of convict labor, or for any other purpose, that would deprive them in any degree of the .full and exclusive control of the prisoners and prison labor, or of the grounds, buildings and property with which they are charged by the act. To that extent, at least, any such contract would be inoperative and void."

Differing from the California statute, our statute expressly authorizes the superintendent of the penitentiary and the financial agent to enter into contracts for the hire of convict labor, and, agreeing with the California statutes, requires the penitentiary officials to keep personal oversight of the convicts while laboring, showing that the hiring under our system does not imply that this personal management and control can be relinquished at all. The learned judges, moreover, were careful to say that, "to that extent, at least, any such contract would be inoperative and void." Well, should it go to the extent of depriving the state's agent of this personal control and management, if that was the intention of the California contract, it would certainly be void in this state. But the contract involved here was not so designed or intended, from all that appears on its face and the pleadings in the case.

Counsel say further, in their motion for rehearing, "that they cited the following case to the point that an officer could not make a contract to extend beyond his term of office." That is the real point in issue, but do the citations sustain the motion on that ground? The first of this list of cases, *Trask* v. *State,* 3 Vroom, (N. J. L.), 478, is truly more nearly analogous in its facts than any other cited by counsel, but it is a more or less novel case in its determination and in the reasoning of the court on the subject. The facts were that the prison keeper had, under an agreement (whether written or verbal is not stated), at the instance of defendants, furnished them with the labor of 250 prisoners, at the state prison of New Jersey, from the 1st day of December, 1861, up to the day of the commencement of the action in assumpsit by the state against the hirers of this labor, which was on the 17th day of March, 1864, a period of two years and four months nearly, at the rate of 31 cents per day for each prisoner. It was agreed

that 31 cents per day from December 1, 1861, to October 5, 1863, was a fair compensation for the labor of each convict, and from that time until the institution of the suit 35 cents would be a fair compensation; the defendants contending that the agreement or contract fixed the former rate, and that this contract should hold good throughout, while the state contended that the contract could run no longer than the official term of the keeper, who made the same, which term expired in the spring of 1862, and that for the remainder of the time the price of the labor should not be regulated by stipulation in the contract, but by the rule of *quantum meruit*, and under that rule it was agreed that 35 cents was a fair price for the labor. The suit was for the difference, $4,917.98. In this way it was determined under the statutes of New Jersey whether in such case a contract of hiring convict labor could not run longer than the official term of the officer making it.

The case was tried in the supreme court of New Jersey, which in that state appears to have original jurisdiction to try cases. In delivering the opinion of the court, Vredenburgh, J., said: "It appears, by the case submitted, that on the 25th of November, 1861, Mr. Stoll, the then keeper of the state prison, by agreement farmed out to the defendants the labor of 250 prisoners for four years, from the 1st of December, 1861, at prices therein specified. Stoll went out of office in the spring of 1862, and was then succeeded by Mr. Hoagland, who in turn was succeeded by J. B. Walker, the present incumbent, in the spring of 1863. The different keepers went on under the contract until October 5, 1863, when it was claimed on behalf of the state that the said agreement was not then binding upon the state, and an agreement was then entered into between Walker and the defendants that the rate of wages should be increased, if it should be judicially determined that said agreement was not then valid. The validity of the contract on the 5th of October, 1863, is claimed by the defendants under the statute which provides that the "keeper may, with the consent of the acting inspectors, contract with any person for the labor of the prisoners or any part of them."

The construction of this clause of the statute of 1846, defining the power and duties of the head keeper of the state prison, was the sole question before the court. The question was determined in favor of the state, to the effect that the prison keeper could not make a contract to run longer than his official term. The defend-

ant appealed to the court of appeals, where the cause was heard, but, the court being equally divided, four for affirmance and four for reversal, on motion of the plaintiff in error, it was ordered that a reargument should be had at the June term following, at which term, the parties having been again heard by their respective counsel, the judgment of the trial court was affirmed, five judges voting for the affirmance and four for reversal. No authorities were cited in either court. The majority, speaking through Judge Green, said: "I think it is clear, from the provisions of the act, that there must be a limitation as to the time during which the contract may be made to extend. The contract for the employment of the prisoners is not a contract merely for the sale of their services, and the question involved is not a mere question how much pecuniary advantage can be extracted from the labor. An important trust is committed to the keeper and inspectors, touching the care and government of the inmates of the prison. They are to have regard to the physical, mental, moral and religious culture of the prisoners. They are to see that undue tasks are not exacted from them. Each convict is to be employed by the keeper, and at his discretion, with the approval of the inspectors, every day except Sundays, as far as may be consistent with their sex, age, health and ability, strictly at hard labor of some sort, in which the work is least liable to be spoiled by ignorance, neglect or obstinacy, and in which the material cannot be embezzled or destroyed. These trusts are reposed in each keeper, and in each board of inspectors. The trust is committed to them to be executed according to their judgment, and cannot be delegated to others. * * * It is not because the keeper cannot, under the terms of the statute, make any contract extending beyond his term of office, but because, as is clearly shown in the opinion of the supreme court, the binding power of such contract must inevitably interfere with the discharge of the duties of their office by the acting keeper and inspectors."

In all the discussion in both courts we are unable to discover whether or not the effect of the contract was to permit the convicts to work beyond the walls and prison cells, and not under the eye and strict supervision of the keeper, made a requirement in other parts of the statutes of that state at the time. But from the argument of both courts one would naturally infer that the contract permitted the hired prisoners to be worked outside the penitentiary.

It is impossible for us to examine all the statutes of that state on the subject, and therefore we cannot determine, as was said by the trial court in that case, from the section under consideration, "as well as from all legislation upon the subject of the state prison," what really should have been decided by the courts of that state. The argument of the court, looking at the matter from the standpoint of the rules as applied to the construction of statutes in this state, is not by any means satisfactory to us. If the court of appeals meant to say that any contract which relieves the keeper of the personal oversight of the prisoners of that state is null and void *ipso facto,* we will have to agree with them; but if it meant to say that a keeper is relieved of this oversight because his predecessor has deprived him of it by a contract running into his term, we have only to say we do not understand the court's meaning, since every keeper has the same qualifications, the same duties and obligations resting upon him, as had his predecessor, to overlook the prisoners. The mere matter of who is paying for their labor is nothing, so it be enough.

In *Board of Commissioners* v. *Taylor,* 123 Ind. 148, a retiring board of county commissioners, before retiring and making way for their successors, appointed an attorney for the county, whose term should commence with that of the incoming board. It is everywhere held that such an appointment is invalid, and not binding on the new board; it sometimes being held to be contrary to public policy, and sometimes it is little less than a fraud upon the law and incoming administration.

There is some peculiar circumstance connected with all the other cases cited that renders them inapplicable to the case in hand.

In this state the official term of penitentiary commissioners is the same as the executive offices they hold for the time being; in fact, in filling certain of the chief executive offices of the state, they are penitentiary commissioners by operation of law, and their terms are coexisting and contemporaneous. So also are the terms, substantially, of their appointees and subordinates. They are not authorized by statute to hire the labor of convicts, unless they cannot be made self-sustaining by being worked on the system known as "state account." When that condition does exist, however, they must resort to the contract system, for one of the prime objects of the state is to make the penitentiary self-sustaining. The commissioners are clothed with a sound discretion to determine

when they shall hire the labor of the convicts or any number of them. They evidently have the discretion to determine upon the time which the contract shall run, for they are to do the very best for the state, the convicts having really no interest in this particular matter, and it may be, and frequently is, to the interest of the state to contract for long terms. To say that these contracts can only run for two years and less time is to put an obstacle in the way that might defeat the whole object and purpose of the statute. The other contracting party necessarily must be consulted as to this matter. Under the law great expense must be incurred to provide a place and machinery and appliances where convicts may be profitably worked under the supervision of the penitentiary officials, and private persons are not disposed to incur these heavy outlays unless the labor can be secured for periods that will in some sort repay them for the outlay. These are. matters for the contractors and penitentiary officials, and not the courts, to determine, at least as matters of law, and as the statute puts no limit of time upon them, their discretion in that regard can only be controlled by proper allegation and proof of an abuse of it.

The old contract system was such that a contract running less than ten years could not be made. The long time had a reason in it, and hence was enjoined by law. While the system has been changed, and the lease system abolished in some respects, the reason as to the time contracts may run remains the same.

Motion overruled.

BATTLE and RIDDICK, JJ., dissent.