Cite as 2022 Ark. 32

# SUPREME COURT OF ARKANSAS

No. CV-21-581

| | |
|---|---|
| | **Opinion Delivered:** February 17, 2022 |
| JOHN THURSTON, IN HIS OFFICIAL CAPACITY AS SECRETARY OF STATE OF THE STATE OF ARKANSAS; SHARON BROOKS; BILENDA HARRIS-RITTER; WILLIAM LUTHER; CHARLES ROBERTS; JAMES SHARP; AND J. HARMON SMITH, IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE ARKANSAS STATE BOARD OF ELECTION COMMISSIONERS<br>APPELLANTS | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT [NO. 60CV-21-3138]<br><br>HONORABLE WENDELL L. GRIFFEN, JUDGE |
| V. | |
| THE LEAGUE OF WOMEN VOTERS OF ARKANSAS; ARKANSAS UNITED; DORTHA DUNLAP; LEON KAPLAN; NELL MATTHEWS MOCK; JEFFERY RUST; AND PATSY WATKINS<br>APPELLEES | AFFIRMED. |

**KAREN R. BAKER, Associate Justice**

Appellees, the League of Women Voters of Arkansas and Arkansas United, Dortha

Dunlap, Leon Kaplan, Nell Matthews Mock, Jeffery Rust, and Patsy Watkins ("the League")

filed suit against appellants John Thurston, in his official capacity as the Secretary of State

of the State of Arkansas; and Sharon Brooks, Bilenda Harris-Ritter, William Luther, Charles

Roberts, James Sharp, and J. Harmon Smith, in their official capacities as members of the

Arkansas State Board of Election Commissioners ("Thurston") alleging that four acts passed by the 93rd Session of the Arkansas General Assembly were unconstitutional––Act 736, Act 973, Act 249, and Act 728. The League refers to the acts as the "Absentee Application Signature Match Requirement," the "In-Person Ballot Receipt Deadline," the "Voter ID Affidavit Prohibition," and the "Voter Support Ban," respectively. Thurston moved to dismiss based on sovereign immunity. The circuit court denied the motion. Pursuant to Arkansas Rule of Appellate Procedure–Civil 2(a)(10) (2021), Thurston filed this appeal, which permits an interlocutory appeal from "an order denying a motion to dismiss . . . based on the defense of sovereign immunity or the immunity of a government official." *See* Ark. R. App. P.–Civ. 2(a)(10); *City of Little Rock v. Dayong Yang*, 2017 Ark. 18, at 4, 509 S.W.3d 632, 634 (internal citations omitted) ("[W]e do not hear on appeal any issue other than whether the circuit court erred in denying summary judgment on the issue of immunity."). We affirm.

On May 19 and July 1, 2021, the League filed its complaint and its amended complaint for injunctive and declaratory relief alleging that the four acts violate various provisions of the Arkansas Constitution. Specifically, the League alleged that Act 736 makes it substantially harder for voters to obtain an absentee ballot by making the signature-matching process more unreliable and error-prone, thereby disenfranchising voters properly entitled to absentee ballots. With regard to Act 973, the League alleged that the Act unjustifiably shortened the deadline for voters to return absentee ballots in person, thereby disenfranchising voters without reasonable justification. The League further alleged that Act

2

249 enacted a strict voter-identification requirement and eliminated the "Affidavit-Fail Safe" written affirmation for voters who lacked an accepted form of voter identification, thereby disenfranchising voters who do not have acceptable voter identification. Last, the League alleged that Act 728 restricts the expressive activities of nonprofit nonpartisan groups and criminalizes entering an area within 100 feet of a polling place unless the person is entering or leaving the building where voting is taking place for lawful purposes. The League alleged that Act 728 is unnecessarily vague and impedes nonpartisan voter-support activities by excluding nonvoting caretakers, friends, and family from providing support to voters waiting in line. The League alleged that these four Acts violate the following provisions of the Arkansas Constitution: article 2 sections 3, 4, and 6; article 3 sections 1 and 2; amend. 51 section 19; the Free and Fair Election Clause; the Equal Protection Clause; the Voter Qualification Clause, and the Free Speech and Assembly Clauses of the Arkansas Constitution; and that the Affidavit Prohibition violates section 19 of amendment 51. The League sought declaratory relief to declare the legislative Acts at issue unconstitutional and to enjoin enforcement of the Acts.

On June 18 and July 20, 2021, pursuant to Rule 12(b)(6) of the Arkansas Rules of Civil Procedure, Thurston filed a motion to dismiss and amended motion to dismiss alleging, among other things, that Thurston was entitled to sovereign immunity. On October 1, 2021, the circuit court conducted a hearing. On November 1, the circuit court entered an order finding that

sovereign immunity does not bar [the League's] claims. The Supreme Court has long recognized an exception to the defense of sovereign immunity when the State is acting illegally, unconstitutionally, or if a state agency officer refuses to do a purely ministerial action required by statute. . . . [The League] allege[s] that the Challenged Provisions are unconstitutional, satisfying the exception to sovereign immunity. . . . Whether the validity of the challenged legislative enactments is governed by rational basis or strict scrutiny review is a question of law that requires consideration of the facts pertinent to the challenged enactments.

. . . .

[The League] allege[s] that the Challenged Provisions burden their fundamental rights to vote, speak, and assemble, and that strict scrutiny applies. . . . The Amended Complaint alleges how [the League is] . . . burdened or impaired in their exercise of their fundamental rights under the Challenged Provisions, that in certain circumstances their fundamental rights and those of others who are similarly situated will be outright denied, and the threat of harm is imminent. The Amendment Complaint also alleges that [Thurston] lack[s] any compelling state interest in the Challenged Provisions, and that they are not the least restrictive method available to carry out any such interests. Because these are questions of fact, the issue of which legal standard applies is not ripe for determination and will be addressed when the case is considered with the merits. However, the court holds that the amended complaint contains sufficient factual allegations to withstand dismissal at this stage as to those assertions.

From that order, Thurston filed the instant timely interlocutory appeal. On December 15, 2021, we granted Thurston's motion to expedite his appeal. For reversal, Thurston presents three points: (1) Thurston is entitled to sovereign immunity; (2) the applicable standard to assess the Acts is rational basis; and (3) the Acts are constitutional.

This appeal stems from the circuit court's denial of Thurston's motion to dismiss. "When reviewing a circuit court's order granting [or denying] a motion to dismiss, we treat the facts alleged in the complaint as true and view them in the light most favorable to the plaintiff. *Wade v. Ferguson*, 2009 Ark. 618, at 2, 2009 WL 4723356. 'In testing the sufficiency

4

of a complaint on a motion to dismiss, all reasonable inferences must be resolved in favor of the complaint, and all pleadings are to be liberally construed. *Id.* When a complaint is dismissed on a question of law, this court conducts a de novo review. *State v. West*, 2014 Ark. 174, 2014 WL 1515898; *Fatpipe, Inc. v. State*, 2012 Ark. 248, 410 S.W.3d 574.' *Steele [v. Thurston]*, 2020 Ark. 320, at 4, 609 S.W.3d 357, 361. The standard of review for the granting [or denying] of a motion to dismiss is whether the circuit court abused its discretion. *Henson v. Cradduck*, 2020 Ark. 24, 593 S.W.3d 10." *Kimbrell v. Thurston*, 2020 Ark. 392, at 5–6, 611 S.W.3d 186, 190. Further, "we look only to the allegations in the complaint and not to matters outside the complaint. However, we treat only the facts alleged in the complaint as true but not a plaintiff's theories, speculation, or statutory interpretation." *Arkansas State Plant Bd. v. McCarty*, 2019 Ark. 214, at 5, 576 S.W.3d 473, 476 (internal citations omitted).

With these standards in mind, we turn to the issue before us. We note that although Thurston has presented three points in this interlocutory appeal, the only issue we have jurisdiction to review is whether Thurston is entitled to sovereign immunity. *See* Ark. R. App. P.–Civ. 2(a)(10); *Williams v. McCoy*, 2018 Ark. 17, at 5, 535 S.W.3d 266, 269. Further, the circuit court did not rule on the merits of this matter. Instead, it denied Thurston's motion to dismiss the League's complaint and amended complaint, including denying his motion to dismiss based on sovereign immunity, which is the sole basis of our jurisdiction in this matter. Accordingly, the only issue before us is whether the circuit court erred when it denied Thurston's motion to dismiss based on sovereign immunity.

On appeal, Thurston contends that he is entitled to sovereign immunity and that the League has not pled sufficient facts to allege the unconstitutionality of the Acts at issue. Thurston further asserts that the League has failed to plead sufficient facts upon which relief could be granted against the challenged Acts and that Thurston is entitled to sovereign immunity. Relying on *Martin v. Haas*, 2018 Ark. 283, 556 S.W.3d 509, the League responds that the only analysis necessary to determine whether Thurston is entitled to the defense of sovereign immunity is to determine whether the League sufficiently alleged a violation of constitutional rights and only seeks equitable relief; if the League did sufficiently plead such, then Thurston is not entitled to sovereign immunity.

In *Haas*, 2018 Ark. 283, 556 S.W.3d 509, Haas, a voter, filed a declaratory action seeking a declaration that an act related to voter registration be declared unconstitutional and enjoin enforcement of the act. On appeal, Martin, as Secretary of State, contended that he was entitled to sovereign immunity. We held that sovereign immunity was not applicable. We explained that although Martin raised sovereign immunity, "[b]ecause [Haas] has asserted that Act 633 violates qualified voters' constitutional right to vote and seeks declaratory and injunctive relief, not money damages, this action is not subject to the asserted sovereign-immunity defense." *Id.* at 8, 556 S.W.3d at 515. Although we granted Haas no declaratory or injunctive relief on his claims, we concluded that sovereign immunity did not provide a basis for dismissal.

Here, as in *Haas*, the League has alleged that specific acts violate the Free and Fair Election Clause; the Equal Protection Clause; the Voter Qualification Clause, and the Free

6

Speech and Assembly Clauses of the Arkansas Constitution; and that Act 249 additionally violates section 19 of amendment 51 of the Arkansas Constitution. The relief sought by the League, declaratory and injunctive relief regarding the alleged conflict between the Acts and the Arkansas Constitution, is the same relief that was sought by Haas. Accordingly, here, as in *Haas*, Thurston is not entitled to sovereign immunity. Therefore, we affirm the circuit court's order denying Thurston's motion to dismiss based on sovereign immunity.

Affirmed.

WOOD, J., concurs.

WOMACK, J., dissents.

**RHONDA K. WOOD, Justice, concurring.** I write separately to address the importance of interpreting the constitution according to its original meaning. *Board of Trustees v. Andrews*[1] marked this court's return to interpreting article 5, section 20 of the Arkansas Constitution as the framers intended. The General Assembly lacks the power to override this provision, which states, "The State of Arkansas shall never be made defendant in any of her courts."[2] But following *Andrews*, the language "the State shall never be made a defendant" has been plucked out of context and misinterpreted in a way that could strip our citizens of vital constitutional protections. This provision, when properly understood, (i) limits money-

---

[1]2018 Ark. 12, 535 S.W.3d 616.

[2]Ark. Const. art. V, § 20.

damage claims against the State but (ii) allows declaratory and injunctive relief against state officials who act illegally or unconstitutionally.

We should first look to the constitutional text. If uncertainty and ambiguity exist, we can then consider the text according to its original meaning. The question raised here involves how to define "the State" as described in article 5, section 20.[3] We have one clue about the scope of "the State" in our caselaw about administrative appeals from agency adjudications. We have allowed those appeals to proceed in the face of sovereign-immunity challenges. Even though the agency was a state entity and was the named defendant in circuit court, we held that the agency was really a tribunal or quasi-judicial decision maker.[4] Article 5, section 20 did not consequently bar the "appeal." No sitting justice disagrees with this

---

[3]I disagree with the dissent that the critical interpretive point is the meaning of "never" rather than "the State." The dissent also cites numerous minority opinions from this court and the U.S. Supreme Court to explain its sudden shift to sovereign-immunity absolutism. Some of these citations don't support the propositions for which they are cited; for example, one case involved the interpretation of "qualified electors" and never discussed sovereign immunity. *Barrett v. Thurston*, 2020 Ark. 36, at 13, 593 S.W.3d 1, 9 (Wood, J., dissenting). Other citations are self-refuting; for example, the dissent cites a case discussing charitable immunity—an affirmative defense—to "prove" that sovereign immunity isn't an affirmative defense. *Davis Nursing Ass'n v. Neal*, 2019 Ark. 91, at 8, 570 S.W.3d 457, 462 (Wood, J., concurring); *Seth v. St. Edward Mercy Med. Ctr.*, 375 Ark. 413, 417, 291 S.W.3d 179, 183 ("[C]haritable immunity is an affirmative defense that must be specifically pled.").

[4]*Ark. Oil & Gas Comm'n v. Hurd*, 2018 Ark. 397, at 11, 564 S.W.3d 248, 255.

view.[5] Likewise, this court has unanimously allowed inmates to pursue civil complaints against the State in the context of their incarceration.[6]

Nor does the provision bar claims against State officials who act illegally, unconstitutionally, or ultra vires.[7] These actions are not truly against the State, but against rogue State officials whom the courts can enjoin. This is similar to the U.S. Supreme Court's doctrine that a lawsuit to enjoin a State official from taking unlawful action does not implicate State sovereign immunity under the Eleventh Amendment because such an officer is "stripped of his official or representative character" and may be "subjected . . . to the consequences of his individual conduct."[8] In other words, a state official who acts unlawfully does so "without the authority of . . . the state in its sovereign . . . capacity."[9]

The historical record provides other helpful guidance in determining the provision's original meaning. As we said in *Andrews*, before the 1874 Constitution, the General Assembly had the power to pass laws authorizing citizens to sue the State of Arkansas for

---

[5]*E.g.*, *Ark. Dep't of Hum. Servs. v. Mitchell*, 2021 Ark. 188 (affirming unanimously agency decision based on substantial evidence rather than sovereign immunity).

[6]*E.g.*¸ *Muntaqim v. Hobbs*, 2017 Ark. 97, at 4, 514 S.W.3d 464, 468 (requiring circuit court to further consider a prisoner's First Amendment claim against prison officials).
[7]*Martin v. Haas*, 2018 Ark. 283, at 7, 556 S.W.3d 509, 514.

[8]*Ex parte Young*, 209 U.S. 123, 159–60 (1908); *see also* 17A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 4231 (2019) (characterizing *Ex parte Young* as "one of the three most important decisions the Supreme Court of the United States has ever handed down," alongside *Marbury v. Madison* and *Martin v. Hunter's Lessee*).

[9]*Id.*

monetary damages.[10] But a dramatic shift happened between the Constitution of 1868 and the current Constitution of 1874: the State's citizens wanted to protect themselves from government overreach and to protect an overspending government from itself.[11] These concerns about excessive government power show that the original meaning of article 5, section 20 was to prevent the legislature from enacting laws subjecting the State to financial liability.

The 1874 Convention reflected the State's perilous financial condition. The State carried debt totaling approximately 20 million dollars.[12] Taxes were at an all-time high.[13] "Foremost in the minds of the delegates was the dangerous financial condition of the State."[14] One of the first acts at the convention was to call for a report on the State's finances, and the delegates spent weeks focusing on financial issues.[15] The changes between the 1868 Constitution and the 1874 Constitution reveal decision after decision to limit the

---

[10]2018 Ark. 12, at 6, 535 S.W.3d at 620.

[11]*See generally* Rodney Waymon Harris, Arkansas's Divided Democracy: The Making of the Constitution of 1874 (2017) (Graduate Theses and Dissertations), available at http://scholarworks.uark.edu/etd/2446 [https://perma.cc/DLQ7-BBVK].

[12]*Id.* at 62.

[13]Walter Nunn, *The Constitutional Convention of 1874*, Arkansas Historical Association, The Arkansas Historical Quarterly 177, 182 (Winter 1968).

[14]*Id.* at 193

[15]*Id.* at 194.

government's ability to further financially strain the State. Some examples include the prohibition on incurring debts and the "severe restraints on the taxing powers of both state and local governments by imposing low maximum rates."[16] Article 5, section 20 also highlights these concerns about the State's purse. The provision "almost certainly was a reaction to the lawsuits filed over the years to collect" the State's outstanding bond debt.[17]

The 1874 Convention also took place when many were concerned with excessive government power. "Opposition to centralization . . . became an overarching theme."[18] The delegates at the 1874 Constitutional Convention "enable[d] people to exercise more direct control over their elected officials."[19] Most scholars emphasize the shift from 1868 to 1874 as being "devoted to what the state and local governments" could not do.[20] Commentators often call the 1874 Constitution the "thou shalt not" constitution.[21] This constitution was

---

[16]Ark. Const. art. XVI, § 1 ("Neither the State nor any city, county, town . . . shall ever lend its credit . . . ."); Jeannie Whayne et al., *Arkansas: A Narrative History* 256 (2d ed. 2013); *see also* Nunn, *supra* note 12, at 194–200.

[17]Mark H. Allison, Sovereign Immunity: Holford Bonds, the Brooks-Baxter War, and the Constitutional Convention of 1874, Ark. Law., Winter 2019, at 44.

[18]Harris, *supra* note 11, at 30.

[19]Nunn, *supra* note 13, at 200.

[20]*Id.* at 201.

[21]Id.

designed to protect the people from overreach and "precluded . . . strong executive leadership and activist government."[22]

The *Andrews* decision fits perfectly within this textual and historical context. There, the legislature had enacted the Arkansas Minimum Wage Act, allowing individuals to recover monetary damages against the State. This court correctly found the Act to be an impermissible legislative waiver.[23] We said never means never and returned to prior case law that did not allow such a waiver. We reached the same conclusion about the Arkansas Whistle-Blower Act when the plaintiff there sued a State agency for money damages.[24] Put simply, article 5, section 20 insulates the State's treasury from monetary claims—whether sanctioned by the legislature or not.

The same week that this court decided *Andrews*, we also decided *Williams v. McCoy*, a case where the plaintiff alleged state officials acted illegally.[25] We did not extend the *Andrews* holding but rather considered the case on the merits and whether the plaintiffs pled sufficient facts. That the court decided two cases implicating the State as a defendant, with different results based on the relief sought, speaks volumes. Since *Andrews*, this court has

---

[22]Whayne, *supra* note 16, at 256.

[23]2018 Ark 12, at 11, 535 S.W.3d at 622

[24]*Ark. Cmty. Correction v. Barnes*, 2018 Ark. 122, at 3, 542 S.W.3d 841, 843.

[25]2018 Ark. 17, 535 S.W.3d 266.

continually interpreted article 5, section 20 as allowing citizen-led claims against State officials who act illegally or unconstitutionally.[26]

And no historical document suggests the provision's original meaning stripped power from the people to hold their government officials accountable. Any such document would be anomalous: the 1874 delegates wanted more citizen control over government––not less. To now interpret the provision as handcuffing the people from seeking relief in state court for other constitutional rights enshrined in the 1874 Constitution would upend that document's primary goal. And it is the people of Arkansas—not government bureaucrats— who are truly sovereign under our constitution.[27] Why would the people of Arkansas pass a constitution that gave them individual liberty, freedom of speech, freedom of assembly, and the right to bear arms, and at the same time destroy their ability to vindicate such rights in state court? Article 5, section 20 cannot be elevated above these rights.

Consider the following factual scenario: during a state of emergency, members of the executive branch issue interim orders aimed at curbing the emergency. But the orders plainly contradict the Arkansas Constitution and statutory law. Sovereign-immunity absolutism would bar citizens from filing lawsuits to enjoin the officials from enforcing these illegal

---

[26]*See, e.g., Martin v. Haas, supra*; *McCarty v. Ark. State Plant Bd.*, 2021 Ark. 105, 622 S.W.3d 162; *Ark. Dep't of Fin. & Admin. v. Carpenter Farms Med. Grp., LLC*, 2020 Ark. 213, 601 S.W.3d 111; *Ark. Dep't of Hum. Servs. v. Ledgerwood*, 2017 Ark. 308, 530 S.W.3d 336.
[27]Ark. Const. art. II, § 1.

orders. Some might say the legislature can step in.[28] But even then, the legislature can't enforce its own laws—it has the power of the purse, not the power of contempt. The judicial branch provides constitutional harmony and a forum for citizens to enforce their rights. Sovereign-immunity absolutism would decimate the judicial branch and render Arkansas's separation-of-powers perilously asymmetrical. The framers would have abhorred this imbalance.

The dissent responds with three points. None have merit. First, it argues that "never means never," that the majority has created unwritten exceptions, and that the constitutional language is clear. But if so clear, why has the Arkansas Supreme Court debated its meaning for over a hundred and fifty years? If so clear, why did the dissent admittedly write or join opinions specifically stating the contrary?[29] Second, the dissent contends sovereign-immunity

---

[28]Ark. Const. art. V, § 42 (allowing legislative review of agency rules); Act 403 of 2021 (limiting scope of emergency orders).

[29]While the dissent confesses error in a few cases, many more exist. *See, e.g.*, *Martin v. Haas*, 2018 Ark. at 7, 556 S.W.3d at 514 (joining majority opinion that held sovereign immunity inapplicable when complaint sought declaratory and injunctive relief from an illegal act); *Steve's Auto Ctr. of Conway, Inc. v. Ark. State Police*, 2020 Ark. 58, at 4, 592 S.W.3d 695, 698 (same); *Ark. Dev. Fin. Auth. v. Wiley*, 2020 Ark. 395, at 4, 611 S.W.3d 493, 498 (same); *Harris v. Hutchinson*, 2020 Ark. 3, at 4, 591 S.W.3d 778, 781 (same); *Ark. Game & Fish Comm'n v. Heslep*, 2019 Ark. 226, at 7–8, 577 S.W.3d 1, 6 (joining majority's holding that "claims for injunctive and declaratory relief are not necessarily barred by the doctrine of sovereign immunity"); *Monsanto Co. v. Ark. State Plant Bd.*, 2019 Ark. 194, at 9, 576 S.W.3d 8, 13 (joining majority's holding that "the ultra vires exception is alive and well, and it applies in this case"); *Hutchinson v. McArty*, 2020 Ark. 190, at 7, 600 S.W.3d 549, 553 ("We have previously determined that sovereign immunity does not bar actions for declaratory or injunctive relief.") (Womack, J., dissenting).

implicates subject-matter jurisdiction and must be addressed before any other issue. If that's true, why did the dissent just last week affirm the dismissal of a lawsuit against a *state* district court judge without ever confronting the "jurisdictional" issue of sovereign immunity?[30] Last, the dissent attacks the concurrence and the majority not with law, but with rhetoric and by citing cases that tend to incite political discourse on a national level. But abortion and gay marriage have nothing to do with state sovereign immunity. Objective observers will see this ploy for what it is.

Neither the constitution's text, history, nor its function prohibits citizen-led suits against illegal state actors. These are no exceptions written into to the constitution; rather, the constitutional provision is simply not applicable when the State is not acting as the State.

---

The dissent has also written majority opinions applying "exceptions" to sovereign immunity. *See, e.g.*, *Harmon v. Payne*, 2020 Ark. 17, at 4, 592 S.W.3d 619, 623 (acknowledging ultra vires exception in prisoner lawsuit alleging cruel and unusual punishment); *Muntaqim v. Lay*, 2019 Ark. 203, at 4–6, 575 S.W.3d 542, 546–47 (recognizing prison may restrict First Amendment rights despite constitutional text that says "Congress shall make no law"); *Muntaqim v. Hobbs*, 2017 Ark. at 5, 514 S.W.3d at 468 (reversing and remanding for consideration whether prisoner's First Amendment rights were violated). Indeed, the dissent would have allowed affirmative relief or potential affirmative relief against state officials who have acted unconstitutionally. *See McCarty*, 2021 Ark. 105, at 5–6, 622 S.W.3d at 165 (joining majority opinion ordering removal of members of Plant Board); *Carpenter Farms*, 2020 Ark. 213, at 20, 601 S.W.3d at 123 (joining majority opinion to the extent that it allowed equal-protection claim against Medical Marijuana Commission) (Womack, J., concurring in part and dissenting in part); *Ledgerwood*, 2017 Ark. 308, at 15, 530 S.W.3d at 346 (joining opinion upholding TRO against Department of Human Services).

[30]*See Mahoney v. Derrick*, 2022 Ark. 27 (holding that the affirmative defense of judicial immunity protected a district judge of the 23rd district from suit); *see also* Ark. Code Ann. § 16-7-1110(18)(A) (designating the judges of the 23rd district as state district court judges).

My originalist interpretation adheres to the original intent to provide citizens with more protection and to restrict governmental abuse. For the above reasons, I will continue to apply the plain language and original meaning of the Arkansas Constitution and allow our citizens to seek declaratory and injunctive relief when state officials act illegally.

SHAWN A. WOMACK, Justice, dissenting. What does it mean when the constitution commands that something *never* happen? This court has read never as *except for three circumstances*. *See, e.g., Bd. of Trs. of Univ. of Ark. v. Andrews*, 2018 Ark. 12, at 5, 535 S.W.3d 616, 619–20. There are few clearer commands in our constitution than article 5, section 20. "The State of Arkansas *shall never* be made defendant in any of her courts" leaves no room to read in any of the exceptions that this court has previously recognized. Ark. Const. art. 5, § 20 (emphasis added). Nowhere does the Arkansas Constitution contemplate an exception to sovereign immunity for unconstitutional, illegal, or ultra vires acts; a conclusion otherwise is purely this court's attempt at crafting public policy for the State. *Cf. Ark. Game & Fish Comm'n v. Heslep*, 2019 Ark. 226, at 8, 577 S.W.3d 1, 6.

A faithful interpretation of our constitution requires this court to recognize that the State can never properly be before any of its courts as a defendant. *Ark. Dev. Fin. Auth. v. Wiley*, 2020 Ark. 395, at 9, 611 S.W.3d 493, 500 (Baker, J., concurring). To the extent any of our precedents hold otherwise, they clearly conflict with the unambiguous requirements of our constitution. *See* Ark. Const. art. 5, § 20. The constitution's use of the word "courts" rather than the term "courts of equity" or "courts of law" bolsters this conclusion, as the constitution originally permitted the division of equitable and legal remedies between courts.

Ark. Const. art. 7, §§ 1, 15, *repealed by* Ark. Const. amend. 80, § 22. A blanket prohibition against the State being a defendant in any of its courts is fatal to the suggestion that there are any exceptions, even for unconstitutional, illegal, or ultra vires acts. *See Barrett v. Thurston*, 2020 Ark. 36, at 13, 593 S.W.3d 1, 9 (Wood, J., concurring) ("Fundamental principles of constitutional interpretation require us to read laws as they are written and to give words their obvious and natural meaning.") (cleaned up).

Because the State—absent an express constitutional provision to the contrary—shall never be a defendant in any of its courts, Arkansas courts lack jurisdiction to hear any case where the State is a defendant. *See Wiley*, 2020 Ark. 395, at 9, 611 S.W.3d at 500 (Baker, J., concurring) (noting that "sovereign immunity is jurisdictional immunity from suit"); *see also Andrews*, 2018 Ark. 12, at 5, 535 S.W.3d at 619 ("Sovereign immunity is jurisdictional immunity from suit . . . ."). Doctrines of immunity exist to prevent litigation, not liability. *Davis Nursing Ass'n v. Neal*, 2019 Ark. 91, at 8, 570 S.W.3d 457, 462 (Wood, J., concurring) (discussing charitable immunity, although this general principle of immunity equally applies to sovereign immunity). Once litigation proceeds against an immune defendant, the defendant has essentially lost this protection, regardless of the outcome. *Id.* This is no different when the State is the defendant, and the concurrence does not explain why it should be. *See* Ark. Const. art. 5, § 20.[31]

---

[31]Framing sovereign immunity as an affirmative defense similarly offends the clear text of article 5, section 20; *never* means *never*, and the State is without authority to waive the requirements of our constitution. *Contra Walther v. FLIS Enters.*, 2018 Ark. 64, at 16, 540

The concurrence admirably attempts to defend our precedent as harmonious with the original meaning of article 5, section 20. But it fails to make a convincing argument. This court first recognized an ultra vires exception to sovereign immunity seventy-nine years after we ratified our current constitution. [32] *Shellnut v. Ark. State Game & Fish Comm'n*, 222 Ark. 25, 31, 258 S.W.2d 570, 574 (1953). In *Shellnut*, this court held:

> [E]quity will exercise jurisdiction to restrain acts or threatened acts of public corporations or of public officers, boards, or commissions which are *ultra vires* and beyond the scope of their authority, outside their jurisdiction, unlawful or without authority, or which constitute a violation of their official duty, whenever the execution of such acts would cause irreparable injury to, or destroy rights and privileges of, the complainant, which are cognizable in equity, and for the protection of which he would have no adequate remedy at law.

*Id.* (quoting *Jensen v. Radio Broad. Co.*, 208 Ark. 517, 520, 186 S.W.2d 931, 932 (1945)). While this was the first time this court explicitly recognized the availability of such relief for ultra vires acts by the State, it offered no explanation why this departure from the constitution was appropriate. The case the court cited in support concerned ultra vires acts of *county officials* rather than state actors. *Shellnut*, 222 Ark. At 31, 258 S.W.2d at 574 (citing *Jensen v. Radio Broad. Co.*, 208 Ark. At 520, 186 S.W.2d at 932).

---

S.W.3d 264, 273 (Womack, J., concurring in part and dissenting in part) (joining the majority's holding that sovereign immunity is an affirmative defense).

[32]Although this court considered whether certain actions by the State were ultra vires in *State ex rel. Utley v. Cox*, there, the State initiated the lawsuit and, therefore, article 5, section 20 does not apply. 154 Ark. 493, 502, 243 S.W. 651, 652 (1922).

Though similar to ultra vires acts, this court recognized an exception to sovereign immunity for illegal state action only twenty-eight years after ratification. In *McConnell v. Arkansas Brick & Mfg. Co.*, this court affirmed an injunction against the Board of Commissioners of Arkansas State Penitentiary to stop the rescission of a contract via resolution. 70 Ark. 568, 589, 69 S.W. 559, 567 (1902). Though the court stated that "[n]o order of the court can be against the state, nor against the defendants to compel them to perform these duties as officers and agents of the state," the majority found equitable relief appropriate when there was a valid, enforceable contract. *Id.* at 591, 69 S.W. at 564, 567. This inconsistent reasoning drew the ire of three dissenting justices, but seven years later, this court overruled *McConnell* and held that there was no vested right to sue the State. *Pitcock v. State*, 91 Ark. 527, 539, 121 S.W. 742, 746 (1909); *accord Caldwell v. Donaghey*, 108 Ark. 60, 66, 156 S.W. 839, 842 (1913) (holding that the lawsuit cannot be maintained because it's against the State). Yet, this court once more reversed course and again recognized an exception for illegal acts forty years later—the same court that decided *Shellnut*. *Fed. Compress & Warehouse Co. v. Call*, 221 Ark. 537, 541, 254 S.W.2d 319, 321 (1953).

In *Hickenbottom v. McCain*, this court held that sovereign immunity did not bar a lawsuit challenging the constitutionality of the Employment Security Division in the Department of Labor because the relief would impose no obligation on the State. 207 Ark. 485, 490, 181 S.W.2d 226, 228 (1944).[33] This exception was apparently unknown until

---

[33]At best, that reasoning is simplistic and specious. Any lawsuit that challenges the constitutionality of an act of the General Assembly obliges the State to defend the law.

seventy years after ratification of our current constitution. *See id.* As with the exceptions for illegal acts and ultra vires acts, decades passed between the State's adoption of sovereign immunity and any assumption that the defense was not absolute. And although the ratifying generation's interpretation of the constitution is not infallible, it is as persuasive as the concurrence's historical analysis of the Constitutional Convention's apparent intentions. *Cf.* Mark H. Allison, *Sovereign Immunity: Holford Bonds, the Brooks-Baxter War, and the Constitutional Convention of 1874*, Ark. Law., Winter 2019, at 44; *cf.* Walter Nunn, *The Constitutional Convention of 1874*, Arkansas Historical Association, The Arkansas Historical Quarterly 177, 182 (Winter 1968). Simply put, *Shellnut*, *Hickenbottom*, *McConnell*, *and Federal Compress* do not sufficiently explain why we should depart from the clear text of our constitution; their disregard of the plain text of article 5, section 20 is shocking.

There is no legitimate reason for this court's decision to depart from such a clear textual command. The drafters of our constitution chose to *never* permit a lawsuit in Arkansas courts when the State is a defendant. Ark. Const. art. 5, § 20. There is no exception if a lawsuit raises the magic words. When advancing an originalist theory, we must focus on the original *public* meaning: what did those who ratified the constitution understand article 5, section 20 to mean? *See Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC*, 140 S. Ct. 1649, 1666 (2020) (Thomas, J., concurring). It is beyond comprehension to suggest

they read never to mean *except for these three exceptions*.[34] Especially considering the absence of these three exceptions for several decades following ratification.

Insofar as the concurrence focuses the constitution's use of *state* in article 5, section 20, neither the parties nor the majority opinion disagrees that the defendants in this lawsuit are branches of the State. Every sitting justice on this court agrees, for example, that State officials sued in their official capacity are entitled to sovereign immunity. *E.g.*, *Ark. Dep't of Fin. & Admin. v. Lewis*, 2021 Ark. 213, at 3, 633 S.W.3d 767, 770. Yet, as with the exceptions made for unconstitutional, illegal, or ultra vires acts, the concurrence cannot cite any constitutional basis to support its suggestion that certain State officials are undeserving of sovereign immunity when acting in their official capacities. *See Arkansas Oil & Gas Comm'n v. Hurd*, 2018 Ark. 397, at 10, 564 S.W.3d 248, 255. Next, the concurrence will argue that article 5, section 20's use of *defendant* does not really mean *defendant*—merely another attempt to make the words of our constitution mean something they do not. The concurrence should not attempt to disguise its argument as textual or originalist, when it better resembles the capacious judicial philosophizing of *Roe v. Wade*, 410 U.S. 113 (1973) and *Obergefell v. Hodges*, 576 U.S. 644 (2015). The concurrence offers a brand of faux originalism that cherry picks a few historical events while ignoring the plain text in an effort to bolster a results-

---

[34]A court errs when it uses the literal meaning over the original, ordinary meaning. *See Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1825 (2020) (Kavanaugh, J., dissenting). Here, however, there is no difference. The literal and original meaning of *never* is the same. It means the same thing in 2022, as it did in 1874.

driven jurisprudence, and, further, it confuses "rhetoric" and "political discourse" with recognition of its judicial philosophy.

Despite its legal shortcomings, I join the concurrence's lamentation of the costs of this interpretation. Indeed, there are legitimate policy considerations for the protection of our citizens that weigh in favor of creation of the exceptions. There are undoubtedly times when the State and its officials injure the public. But results oriented jurisprudence perverts the role of the judiciary. *See, e.g.*, *Lawrence v. Texas*, 539 U.S. 558, 592 (2003) (Scalia, J., dissenting).

When the constitution is clear in its language, as it is here, there is no need for further interpretation. The structural design of our constitution dictates that the power to change article 5, section 20 lies not with the courts, but rather exclusively with the people of the state of Arkansas; our precedent recognizing exceptions to the constitution usurps this constitutionally enshrined prerogative. Ark. Const. art. 5, § 1; Ark. Const. art. 19, § 22.[35] Moreover, reading article 5, section 20 to mean what it says will not completely divest people of relief from the State. Putative plaintiffs in many cases may still recover from the State through the Arkansas State Claims Commission, and federal courts offer avenues of relief for certain claims against the State. *See, e.g.*, *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976)

---

[35]As recently as last spring, the General Assembly introduced a proposed ballot initiative to amend article 5, section 20, which would allow the State to be sued in its courts, as if it were any other party. S.J. Res. 3, Arkansas 93rd General Assem., Reg. Sess. (2021).

(holding that Congress can abrogate sovereign immunity when legislating under its power to enforce the Fourteenth Amendment).

Although this marks a momentous departure from this court's precedent, multiple wrongs do not make a right. When this court's precedent so clearly conflicts with our constitution, we must not blindly follow it for the sake of stare decisis. *See Edwards v. Thomas*, 2021 Ark. 140, at 27, 625 S.W.3d 226, 240–41 (Webb, J., concurring in part and dissenting in part). Stare decisis is an important principle that provides consistency to legal interpretation, but it is more important that we not cleave to mistakes simply because we have maintained them for decades. The common law doctrine of sovereign immunity springs from the theory that "the King can do no wrong." A version of that policy was adopted for the state of Arkansas when the people, as is their right, ratified our current constitution. We must be cautious not to let stare decisis become so absolute in our opinions that we view it as "the court can do no wrong." We took an oath to uphold the Arkansas Constitution, not the *Arkansas Reports*.

Although I have either written or joined opinions[36] that recognized exceptions to sovereign immunity, "it is never too late to surrender former views to a better considered

---

[36]*See, e.g.*, *Ark. Dep't of Educ. v. McCoy*, 2021 Ark. 136, at 12, 624 S.W.3d 687, 694 (Womack, J., concurring in part and dissenting in part); *Hutchinson v. McArty*, 2020 Ark. 190, at 7, 600 S.W.3d 549, 553 (Womack, J., dissenting); *Harmon v. Payne*, 2020 Ark. 17, at 4, 592 S.W.3d 619, 623; *Banks v. Jones*, 2019 Ark. 204, at 4, 575 S.W.3d 111, 115; *FLIS Enters.*, 2018 Ark. 64, at 16, 540 S.W.3d at 273 (Womack, J., concurring in part and dissenting in part). Relatedly, the concurrence's invocation of *Mahoney v. Derrick*, 2022 Ark. 27 is misleading. In *Mahoney*, the plaintiffs brought the bulk of their claims under 42 U.S.C. 1983. The Supreme Court of the United States has held that states cannot divest their courts

position." *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2100 (2018) (Thomas, J., concurring) (cleaned up). A careful study of our constitution and recognition that it controls this State's law rather than our precedent makes this departure not only appropriate but also necessary.

For these reasons, I respectfully dissent.

*Leslie Rutledge*, Att'y Gen., by: *Michael A. Mosley*, Ass't Att'y Gen., for appellants.

*Kutak Rock LLP*, by: *Jess Askew III*, for appellees.

---

of general jurisdiction from the ability to hear federal claims. *Haywood v. Drown*, 556 U.S. 729, 740–41. Accordingly, sovereign immunity could not operate as a bar to those unique claims. *Id.*